## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| BRIAN WINGERD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 18-CV-2024-JAR-KGG |
| | ) |
| KAABOOWORKS SERVICES, LLC, and | ) |
| THE MADISON COMPANIES, LLC, | ) |
| | ) |
| Defendants | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants KAABOOWorks Services, LLC ("KAABOO") and The Madison Companies, LLC ("Madison"), submit this Memorandum in Support of their Motion for Summary Judgment.

## INTRODUCTION

KAABOO provides services to companies that operate live music and culture events, including a Festival occurring each September in Del Mar, California. Plaintiff became KAABOO's Senior Vice President of Marketing in October 2015. In November 2016, Plaintiff informed KAABOO that he had been diagnosed with cancer. KAABOO responded empathetically and consistent with the law. Immediately, KAABOO's Chief Executive Officer called Plaintiff and offered to accommodate him by providing whatever support or accommodation was necessary to allow him to continue working. Plaintiff rejected the Company's support and insisted on being held to "regular guy" performance standards. Thereafter, as Plaintiff admits, he never requested an accommodation of any kind.

Plaintiff did, however, unilaterally take it upon himself to modify the functions of his position without including KAABOO in those decisions. Without KAABOO's approval, he

delegated a number of his job responsibilities to a subordinate, procrastinated on other responsibilities, and began routinely missing meetings relating to his duties and management of the Marketing Department.  Plaintiff's remote working arrangement (he worked from his home in Lawrence, Kansas instead of from KAABOO's headquarters in Denver) allowed him to conceal the fact that he was performing very little work.  Plaintiff's improper delegation of work, procrastination, and failure to manage led to a number of specific failures through 2017, all culminating in his missing a goal for event pass sales – the largest source of Festival revenue – by over thirty percent.

Based on Plaintiff's performance, KAABOO terminated his employment.  To prevent a similar lack of accountability in the future, KAABOO also decided that Plaintiff's replacement should be willing and able to travel, most notably to Denver consistently, to provide face-to-face management of the Marketing Department at KAABOO's corporate headquarters – something Plaintiff never did in the last eleven months of his employment even though nothing about his cancer prevented it.  Plaintiff's contention that he traveled to California in September 2017 misses the point: by that time, KAABOO had spent the previous ten months paying Plaintiff to force his work onto subordinates while Plaintiff's lack of effort cost KAABOO millions of dollars in projected ticket revenues.

Nothing about the law required KAABOO to accommodate Plaintiff against his wishes, much less to overlook his failure to perform job responsibilities throughout 2017 despite his insistence that his cancer would not interfere with his performance.  Although this Court routinely cautions litigants that it does not sit as a "super personnel department," Plaintiff now invites this Court to approve the self-accommodation Plaintiff unilaterally imposed upon

KAABOO.   This Court should reject Plaintiff's invitation and enter summary judgment for Defendant.

## STATEMENT OF UNCONTROVERTED FACTS

1.      KAABOO provides management, employment, and contracting services primarily to companies operating live music and culture events.  [Declaration of Shawna Earnest, ¶ 3].

2.      From the time of KAABOO's formation, through the end of Plaintiff's employment, KAABOO's services predominantly related to a music and culture festival in Del Mar, California, which has been held annually each September since 2015.  [Doc. 5, Amended Complaint, ¶¶ 10-11; Doc. 12, Answer to Amended Complaint, ¶¶ 10-11 (admitting the allegations)].

3.      *Rolling Stone* magazine called the Del Mar Festival "the Ultimate Entertainment Mix-perience," and, since its inception, the Del Mar Festival has featured performance by artists such as Jimmy Buffett, Aerosmith, Snoop Dogg, Red Hot Chili Peppers, Pink, and Jason Derulo.  [Doc. 5, Amended Complaint, ¶ 9; Doc. 12, Answer to Amended Complaint, ¶ 9].   Tens of thousands of people attend the Del Mar Festival annually.  [Doc. 5, Amended Complaint, ¶ 16; Doc. 12, Answer to Amended Complaint, ¶ 16].

4.      Bryan Gordon is the Chairman and Chief Executive Officer of KAABOO.  [Gordon Depo. 98:11 – 98:14].

5.      Shawna Earnest is KAABOO's Senior Vice President of Human Resources.  [Earnest Depo. 11:5 - 11:6, 15:12 - 15:16].

6.      Plaintiff lives in Lawrence, Kansas.  [Wingerd Depo. 5:22 – 5:25].

**I.      Plaintiff Becomes KAABOO's Senior Vice President of Marketing**

7.      After the 2015 Del Mar Festival, Gordon had discussions with Brian Pilsl about employing Pilsl.  [Gordon Depo. 53:9 – 53:13].

8.      Pilsl and Plaintiff were business partners in a company called Sprocket Marketing.  [Wingerd Depo. 44:9 – 44:11].

9.      Pilsl indicated to Gordon in conjunction with their discussions that if he was going to discontinue Sprocket Marketing, he "really needed [Plaintiff] to land somewhere." [Gordon Depo. 53:14 – 53:16].

10.      Understanding that it was a "stretch goal," Gordon decided that Plaintiff could lead KAABOO's Marketing Department.  [Gordon Depo. 53:22 – 53:24].  During discussions about the role with Plaintiff, Plaintiff indicated he was nervous about taking the role because it was not something he had done before and not within his prior experience.  [*Id.* at 53:22 – 54:2; Wingerd Depo. 86:1 – 86:14].

11.      On October 2, 2015, Plaintiff became employed with KAABOO as its Senior Vice President of Marketing.  [Doc. 5, Amended Complaint, ¶ 24; Doc. 12, Answer to Amended Complaint, ¶ 24].

12.      As Vice President of Marketing, Plaintiff's job was to be "the boss of the department," and to "be responsible for . . . every function of the department."  [Wingerd Depo. 132:23 – 133:5].

13.      The Marketing Department was "the primary driver for ensuring that the public knew about the [KAABOO] event . . . [and] to continue to mold the brand and build on the popularity [of the event] from year one."  [Wingerd Depo. 87:10 – 87:20].

14.     At all times throughout his employment, Plaintiff directly supervised Emily Byer. [Wingerd Depo. 258:2 – 258:10; Byer Depo. 21:23 – 22:8].

15.     Byer was Vice President of Marketing.  [Byer Depo. 17:17 – 17:23].  She worked for KAABOO as a contractor before becoming an employee in October 2016.  [*Id.* at 24:3 – 24:5].

16.     Additionally, from the start of his employment through October 2016, Plaintiff supervised all employees within the Marketing Department.  [Byer Depo. 23:16 – 23:23]. Employees in the Marketing Department began reporting to Byer when she became an employee and Vice President of Marketing in October 2016.  [*Id.* at 23:16 – 24:2].

17.     Throughout his employment with KAABOO, Plaintiff was based out of Lawrence, Kansas.  [Gordon Depo. 25:13 – 25:25].

18.     KAABOO's Marketing Department, however, was based out of Denver, Colorado.   Apart from employees on the Street Team who were based in the San Diego, California area, all of the Marketing Department's employees were based out of Denver.

19.     There was a clear expectation, despite Plaintiff's remote working arrangement, that "he would be in person where and when [he needed to be] within the bounds of reason." [Gordon Depo. 170:4 – 170:16].

20.     Prior to his cancer diagnosis, Plaintiff traveled to Denver approximately every other week.  [Wingerd Depo. 242:6 – 242:14].

21.     Even apart from travel to Denver to meet with team members within the Marketing Department, Plaintiff's job required him to travel often.  [Wingerd Depo. 152:24 – 153:5].   He traveled to California to work with local radio stations, participating in the

KAABOO Discovery Tour, promoting KAABOO in bars in San Diego, and "doing all kinds of things" to promote the event.  [*Id.*].

22.     Indeed, traveling nationally and internationally was an essential function of Plaintiff's job as Senior Vice President of Marketing.   [Wingerd Depo. 113:14 – 113:23; Deposition Exhibit 5].

23.     Performing his job in a manner satisfactory to Gordon was also an essential function of Plaintiff's job as Senior Vice President of Marketing.  Plaintiff described Gordon as "God," and agreed that his job performance needed to satisfy him.  [Wingerd Depo. 171:20 – 172:2].

24.     Although not ultimately the basis for Plaintiff's termination, a number of things caused Gordon to believe that Plaintiff was not an "A-plus" employee based on his first year of performance as Senior Vice President of Marketing.   [Gordon Depo. 33:2 – 35:7].   Gordon believed Plaintiff needed to improve in the following areas: (1) Plaintiff was very poor at communicating with Gordon and senior management; (2) Plaintiff was ineffective at collaborating with other departments within the organization and perceived by some as "cliquish;" (3) Plaintiff's marketing skills were limited to email marketing, and weak in areas such as public relations, social media marketing, and non-digital marketing; and (4) timeliness. [*Id.*].

**II.     Event Pass Sales is the "Hallmark" For How Well the Marketing Team is Performing.**

25.     Within KAABOO, the Marketing Department was responsible for Festival pass sales, which is the Festival's single largest source of revenue.  [Gordon Depo. 34:20 – 34:22].

26.     Pass sales is "the hallmark of how well the marketing team and Mr. Wingerd were performing."  [Gordon Depo. 32:18 – 32:22].

27.     Plaintiff was "part of the conversations" for setting KAABOO's pass sales goals. [Wingerd Depo. 101:6 – 101:11].  Following an event, Plaintiff helped "benchmark" the next year's ticket sales forecast and audience growth.  [*Id.*].

28.     Plaintiff also established goals for the 2017 Festival Year relating to various Key Performance Indicators for the Marketing Department, which he believed "would have the highest impact for ticket sales."  [Wingerd Depo. 108:3 – 109:1].

29.     For the 2016 Del Mar Festival, the pass sale goal was 30,000, but KAABOO sold only 27,000 passes.  [Wingerd Depo. 106:21 – 106:24, 114:18 – 115:2].

30.     After Plaintiff did not meet the pass sale goal in 2016, Gordon told him that he needed to do better, and "counseled him that it was going to matter a lot to his long-term tenure with the company whether [KAABOO] did substantially better or not."  [Gordon Depo. 123:1 – 123:10].

31.     In a self-evaluation conducted in January 2017, Plaintiff indicated that his "biggest disappointment" was not meeting the 2016 pass sales goal.  [Wingerd Depo. 180:9 – 180:14; Deposition Exhibit 19].

32.     KAABOO's pass sales goal for 2017 was set at 43,000.  [Wingerd Depo. 212:11 – 213:9; Deposition Exhibit 30].

33.     Gordon believed the pass sales goal for 2017 was attainable.  [Gordon Depo. 106:7 – 106:16].

34.     Plaintiff indicated in an August 2016 email to Byer that he believed KAABOO could sell 50,000 passes for the 2017 Festival.  [Wingerd Depo. 158:18 – 158:25; Deposition Exhibit 16].

### III.     Plaintiff Informs KAABOO of His Cancer Diagnosis and Rejects Any Accommodation.

35.     By way of an email dated November 20, 2016, Plaintiff informed KAABOO's management team that he had been diagnosed with cancer.  [Bates No. BW089266-BW089267; Doc. 113, Pretrial Order, Stipulations, ¶ 1 (stipulating to foundation in relation to all Bates numbered documents produced)].

36.     Shortly after Plaintiff informed KAABOO of his cancer diagnosis, he had a discussion with Gordon about it.  [Gordon Depo. 44:14 – 44:21].  During that conversation, Plaintiff indicated that he was not requesting any "support or accommodation from the company."  [*Id.* at 44:22 – 45:1].  Instead, Plaintiff wanted "to be treated like a regular guy [with the] same expectation, same job description, same duties."  [*Id.* at 45:1 – 45:6; Wingerd Depo. 198:8 – 198:20 ("I'm sure I had said in a way that was I don't want to be treated like a cancer patient," and agreeing he said, "I just want to be treated like everyone else")].

37.     Indeed, Plaintiff admits that from the time he was diagnosed with cancer through the end of his employment with KAABOO, he did not ask for any accommodation.  [Wingerd Depo. 233:17 – 234:10].

38.     Gordon responded to Plaintiff's request for ***no*** accommodations by telling Plaintiff that if, at any point, he needed to reevaluate his needs, KAABOO would be as helpful and supportive as it could and would take its cues from Plaintiff.  [Gordon Depo. 45:25 – 46:4].

39.     Gordon made it clear to Plaintiff that he needed to communicate with KAABOO about his capabilities, if those capabilities changed and he needed additional support:

> What I said to him was, we can deal with pretty much anything, and we're flexible in terms of working with you, but I need you to communicate, and I need you to no overpromise and underdeliver.  I understand this is an imprecise exercise that you are going through, but, you know, I need you to be mindful that you are creating . . . an accountability to the company and to your team members,

and it's better to say, 'I can only do half of X than all of X,' than to promise to do all of X and to do one-third of X because people are relying upon you.  Whereas if you proactively set expectations that are realistic, then the company and your colleagues can plan around it.

[Gordon Depo. 118:19 – 119:7].

## IV.  Despite Insisting on Being Treated Like a "Regular Guy," Plaintiff Does Not Demonstrate "Regular" Performance Throughout 2017.

40.     As 2017 progressed, Gordon became increasingly concerned as Plaintiff's "promise to conduct business as usual became ever more <u>not</u> business as usual."  [Gordon Depo. 130:9 – 130:15, 131:13 – 131:18].

41.     In February 2017, KAABOO named Jason Felts the Chief Marketing Officer for his experience in strategic marketing and brand-development, the ability to provide day-to-day management and leadership to the Marketing Department, and his contacts and relationships that KAABOO could leverage.  [Gordon Depo. 136:24 – 137:17].

42.     Plaintiff was "in favor of" and "very, very glad" Felts was joining KAABOO as the Chief Marketing Officer because Felts possessed a skill set – brand marketing – that Plaintiff did not possess.  [Wingerd Depo. 178:12 – 178:20].

43.     Plaintiff admitted he never bothered attempting to communicate with Felts.  [Wingerd Depo. 175:4 – 175:5].

44.     Felts noticed; Felts believed that Plaintiff did not communicate with him as often as he should have.  [Felts Depo. 68:20 – 69:2].

45.     Plaintiff admits that following his cancer diagnosis, he "leaned on Emily [Byer] more."  [Wingerd Depo. 234:16 – 234:21].  He admits he "was delegating more to her that [he] would have naturally taken on [him]self."  [*Id.* at 248:5 – 248:13].

46.     Byer estimates that Wingerd's delegation of responsibilities to her increased her workload by 10-20% at first, and by 50% as July 2017 approached and before the September 2017 Festival.  [Byer Depo. 127:15 – 128:5].

47.     Byer did "what [she] could to keep the ship afloat and [to] support Wingerd." [Byer Depo. 67:7 – 67:9].  However, her "plate was already pretty full" in terms of her workload. [*Id.* at 68:21 – 69:7].

48.     Byer complained to Parsons about being overworked in 2017.  [Parsons Depo. 154:15 – 154:17].  Byer also expressed frustration to Felts that she was overworked in 2017. [Felts Depo. 169:24 – 170:17].

49.     Following his cancer diagnosis, Plaintiff never again traveled to Denver in conjunction with his employment with KAABOO.  [Wingerd Depo. 242:15 – 242:24].

50.     It was important for Plaintiff to travel to Denver routinely, to manage the Marketing Department and participate in All-Hands Meetings.  [Earnest Depo. 98:6 – 98:9].

51.     All-Hands Meetings are held in Denver, and all department heads are expected to attend.  [Byer Depo. 71:23 – 72:7].

52.     Shortly after Felts joined KAABOO, he flew to Kansas City to meet Plaintiff. [Felts Depo. 65:11 – 65:14].  Felts went to Kansas City because Byer told Felts he would need to travel to Kansas City if he wanted to meet Plaintiff.  [*Id.* at 65:11 – 65:19].

53.     Felts did not believe Plaintiff traveled at all on business between the time Felts joined KAABOO in February 2017 and the time of the Del Mar Festival in September 2017. [Felts Depo. 163:11 – 163:16].

54.     No doctor ever told Plaintiff that his cancer prevented him from traveling.  [Dana Wingerd Depo. 55:25 – 56:4; Huerter Depo. 36:15 – 37:11].

55.     Plaintiff admits the frequency of his communications with Byer and formerly-weekly meetings with the members of the Marketing Department decreased.  [Wingerd Depo. 247:23 – 248:4].

56.     Plaintiff's attendance at weekly Marketing Department meetings was "sporadic" following his cancer diagnosis.  [Parsons Depo. 161:4 – 161:8].

57.     Additionally, the majority of Plaintiff's communication with Gordon was by way of weekly telephonic meetings.  [Wingerd Depo. 173:15 – 173:23].

58.     Throughout 2017, Plaintiff missed a number of telephonic meetings, including meetings with Gordon, weekly Senior Management calls, and weekly Marketing Department meetings.  [Gordon Depo. 171:12 – 171:13, 172:19 – 173:2].

59.     Gordon described the impact of Plaintiff's missed meetings as follows:

[A]nybody could potentially miss a meeting and the company can certainly absorb the impact of that.  I think the cumulative effect of missing meeting after meeting, not only in-person meetings but increasingly telephonic – you know, we have weekly senior management calls.  So, there's lot's of meetings that may not even be physical meetings.  The cumulative effect of missing, you know, more, more, more of those was certainly deleterious to the marketing department and to the company more broadly.  I mean, there was broad concern expressed not just by the marketing team but by colleagues who need to collaborate with the marketing team about, I'm not getting information, I can't get ahold of Wingerd, you know, this is a problem kind of thing.

[Gordon Depo. 171:7 – 171:25].

60.     KAABOO's Human Resources Department had to follow up with Plaintiff in 2017 regarding his lack of response in relation to his own personal review as well as completing performance reviews for his direct reports.  [Earnest Depo. 37:25 – 38:2].

**Specific failures throughout 2017 were coupled with, if not caused by, Plaintiff's unilateral decision to shift his responsibilities onto others:**

A.   **Plaintiff Procrastinated in Securing a Vendor to Rebuild KAABOO's Website.**

61.   In 2017, KAABOO reworked its website. [Gordon Depo. 41:24 – 42:5]. Plaintiff was responsible for securing a vendor for the website rebuild. [*Id.* at 42:8 – 42:12; Wingerd Depo. 255:20 – 255:25].

62.   Gordon believed the process for securing a vendor for the website rebuild should have been a robust process, in which Plaintiff sought proposals from a number of different firms. [Gordon Depo. 42:8 – 42:11]. Instead, Plaintiff secured one proposal from one vendor in relation to the website rebuild:

> It took Mr. Wingerd a long time to begin on that process. He ultimately wound up only finding one or two firms. In sum and substance we were really stuck with one option. So we not only didn't have competitive pricing pressure, which is a missed opportunity from a management point of view, but we didn't get the benefit of sort of the intellectual capital accumulation from talking to different prospective vendors. . . . Even if we might have ultimately selected the firm that we selected, we certainly could have known more to frame the requirements and the engagement of that firm, and we certainly could have gotten a better price, in my opinion, if we had gone through a more robust process.

[*Id.* at 42:11 – 42:25].

63.   Consequently, KAABOO ultimately retained the website vendor identified by Plaintiff because Gordon perceived KAABOO's "back was against the wall because [KAABOO] need[ed] the new website before the 2017 line-up announcement, which was roughly in the middle of March of 2017 [and] it's game over if you don't have your website up and functioning on the biggest marketing day of the year." [Gordon Depo. 43:1 – 43:8].

64.   Plaintiff described the line-up announcement as the "big, big one" in terms of the relative significance of KAABOO's marketing events. [Wingerd Depo. 145:6 – 145:11].

65.     Plaintiff agreed KAABOO "[n]eeded the website functioning and up [and] rolling before the biggest announcement of the year." [Wingerd Depo. 159:20 – 160:7].

66.     The redesigned website was aesthetically "beautiful," but was not "efficient in terms of functionality and the ability to quickly [determine] what pass level you wanted to buy [or] what ancillary items you might want to buy, like parking[.]" [Felts Depo. 51:5 – 51:16]. The website "was very confusing from a consumer's perspective." [*Id.*].

67.     Months later, on September 25, 2017, a KAABOO employee spoke with a vendor representative regarding changes to the website's ticketing page, emphasizing "divid[ing] the [ticketing] page into categories with headers and custom formatting." [Bates No. BW117238-BW117240]. The vendor representative indicated, "these are all possible functions with the right web designer and custom HTML code combination." [*Id.*]. The KAABOO employee reported the results of her discussion to Gordon and Felts. [*Id.*].

68.     Upon learning about the website vendor's ability to fix the website, Gordon wrote to Felts, "Absolutely incredible to me that [Plaintiff] never uncovered this issue/option before now…maddening!!!" [Bates No. BW117238-BW117240].

69.     KAABOO's management did not believe the 2017 website rebuild resulted in a satisfactory level of increased ticket sales. [Parsons Depo. 34:12 – 35:18].

**B.     Plaintiff Procrastinated in Securing an Effective "Street Team" Coordinator.**

70.     "Street Team" marketing is "the most basic form of marketing known to man." [Gordon Depo. 62:15 – 63:4]. Gordon described the purpose of Street Team marketing as follows:

> [The Street Team is] old school marketing. Hand out fliers, put posters in bars, put coasters in restaurants with the KAABOO brand on it. Attend events that might have a relevant demographic, or walk the beach and say hello to people and give them swag to get them intrigued about KAABOO. You know, put a booth at a street fair and give away free hats and a discount code if you buy a ticket.

[Gordon Depo. 62:15 – 63:4].

71.     Street Team marketing is a common marketing concept within the entertainment industry.  [Byer Depo. 32:9 – 32:11].

72.     Plaintiff admits that the Street Team was "a concept that was close to [Gordon's] heart" that would "move the needle" in terms of sales.  [Wingerd Depo. 259:12 – 259:16].

73.     Gordon believes deployment of KAABOO's Street Team should be "a year-round exercise."  [Gordon Depo. 63:4 – 63:7].

74.     Byer believes it is important to have a <u>functioning</u> Street Team by the time of KAABOO's line-up announcement in March.  [Byer Depo. 32:22 – 34:3].

75.     The Street Team constituted approximately ten percent of KAABOO's marketing budget.  [Gordon Depo. 64:18 – 64:25].

76.     Plaintiff admits, "Gordon always believed we could be doing more on the street team."  [Wingerd Depo. 259:8 – 259:11].

77.     Gordon was dissatisfied with KAABOO's Street Team in 2016.  [Byer Depo. 39:22 – 39:9].

78.     On January 3, 2017, Byer emailed Earnest, copying Plaintiff, indicating that Gordon "is really anxious" that KAABOO fill the Street Team Coordinator position during the month of January 2017.  [Bates No. BW091046].

79.     Indeed, the Street Team Coordinator position had been vacant since October of 2016 and, consequently, there was no Street Team during this timeframe.  [Parsons Depo. 142:13 – 143:10].

80.     In an email of January 23, 2017, regarding hiring a Street Team Coordinator, Earnest wrote to Byer and Wingerd that Gordon "stated he is 'hopping f-ing' mad that we don't

have this position filled as of yet. . . . We needed to fill this position as of 2/1." [Bates No. BW190436-BW190440].

81.     In an email to Gordon of February 13, 2017, Plaintiff presented "business reasons" he believed a candidate named Josh Harper was the best option for the role of Street Team Coordinator.  [BW113438 – BW113439].

82.     Gordon responded to Plaintiff's February 13, 2017 email by approving the hiring of Harper, but only because he had "no choice" because "our backs are totally up against the wall." [BW113438 – BW113439].  Gordon responded to Plaintiff's business reasons for the hire as follows:

> I believe that this business case, as articulated, is weak…does not justify why we should spend an extra ~$15k on this position vs. our agreed-upon budget.  I also don't understand exactly what part of our 'digital' budget we'd be surrendering and why that's okay.  Please re-do and complete.
>
> That being said, this is a critical part of our 3/23 lineup launch plan (focus on college campuses marketing) and our backs are totally up against the wall (it's 2/13 today).  So, I have no choice but to approve hiring Josh.
>
> I was told I would have this business case info from you on Th 2/2, and by Emily several weeks before that.  This position was supposed to be FILLED weeks ago.  Nothing about how this has been handled is ok, let alone impressive.  Josh had better be a home run and justify his existence and then some…I will not accept a 3rd year of sub-optimization of this very basic function.
>
> You and your team can, and must, do better!

[*Id.*].

83.     On April 25, 2017, Byer forwarded a "weekly recap" of Harper's activities to Gordon and Felts.  [Bates No. BW095864-BW095867].  After Felts provided some feedback, Gordon responded as follows:

> [Plaintiff] was supposed to take the lead on creating performance metrics for Josh [Harper] in terms of (a) sales activities/events, (b) email sign-ups and (c) ticket

sales, all by week. Once we have that, happy to discuss a performance-based bonus plan.

My instincts are the same as Jason's: this program is not yet dialed-in.

[*Id.*]

84.     Gordon believes Josh Harper was hired as Street Team Coordinator based upon a pattern of procrastination that emerged under Plaintiff's management of the Marketing Department. [Gordon Depo. 67:10 – 67:24]. Gordon described this pattern as, "procrastinating on getting important things done, wind up crunched from a time point of view, have few options, and wind up having to settle for one or two mid-link options as opposed to having a robust set of options to choose from." [*Id.* at 67:17 – 67:24].

85.     Harper was not a "good fit" as the Street Team Coordinator because he was not "actively taking on the role," was not finding events to attend, and was not attending the number of events KAABOO needed him to attend. [Byer Depo. 34:4 – 34:19].

86.     Harper failed as Street Team Coordinator because he did not receive clear expectations from the Marketing Department. [Parsons Depo. 144:3 – 144:12].

87.     Harper was fired as Street Team Coordinator on June 12, 2017, within a few months of being hired. [Byer Depo. 35:13 – 35:14; Bates No. BW190637].

88.     After Harper was fired as Street Team Coordinator, his replacement likewise was not given clear expectations for approximately her first month of employment. [Parsons Depo. 146:7 – 146:23].

   **C.     Plaintiff Did Not Develop an "Influencer Program."**

89.     KAABOO intended to implement an Influencer Program for the 2017 Festival Year. [Gordon Depo. 70:11 – 71:3]. The Influencer Program was Gordon's idea. [*Id.* at 71:4 – 71:7].

90.     Plaintiff was generally responsible for developing the Influencer Program.  [Byer Depo. 39:5 – 39:9].

91.     Gordon's vision for the Influencer Program included finding an agency that matched "influencers with companies that need influencers."  [Gordon Depo. 71:25 – 72:11]. An example of an "influencer" would be somebody with "100,000 [social media] followers because they have a food blog or have 1.2 million followers because they have a music blog." [*Id.*].

92.     Little was done to launch the Influencer Program under Plaintiff's management. [Gordon Depo. 71:25 – 72:17].  Agencies specializing in matching influencers were never vetted and no relationship with an agency was ever pursued.  [*Id.*].  Influencers that KAABOO utilized for the 2017 Festival ultimately consisted of a "small cadre" of influencers with whom Jason Felts had relationships when he joined KAABOO.  [*Id.*].

**VI.     KAABOO Arranges for Byer to Coordinate the Marketing Department's Efforts at the 2017 Del Mar Festival.**

93.     On July 5, 2017, Plaintiff commenced a six-week medical leave in conjunction with surgery.  [Gordon Depo. 119:14 – 119:20; Earnest Depo. 59:3 – 61:12; Wingerd Depo. 251:22 – 252:5].

94.     Plaintiff's medical leave ended the week of August 21, 2018.  [Deposition Exhibit 23; A00190].

95.     The 2017 Del Mar Festival was scheduled to begin September 15, 2017. [Declaration of Earnest, ¶ 5].

96.     On August 17, 2017, Byer sent the following email to Gordon and others:

Brian [Wingerd] is planning to be back next week.  In addition, he is planning on being on-site at KAABOO.  He is still looking at dates, but tentatively is set for flying in on 9/12 and out on 9/20.  Brian and I plan to catch up on what we can

> get Brian to take back over immediately and support, starting with the data and analytical elements, and email segmentation. Jason and I are planning to connect before that to make sure that we're all aligned.

[Deposition Exhibit 23; A00190].

97.     Gordon decided that Byer, instead of Plaintiff, should manage the Marketing Team's functions on-site at the 2017 Festival because Gordon believed Plaintiff "would have no grounding in . . . what was planned." [Gordon Depo. 150:5 – 150:22].

98.     By way of comparison, leading up to the 2016 Festival, Plaintiff created an outline of the Marketing Team's day-to-day responsibilities and potential, "on-call" responsibilities. [Wingerd Depo. 170:3 – 170:9].

99.     Again, by way of comparison, in the weeks and months leading up to the 2016 Festival, Plaintiff prepared the Marketing Department employees for the Festival by explaining the reasons for everything the Marketing Department would do during the 2016 Festival. [Parsons Depo. 135:14 – 137:5].  During this timeframe shortly before a Festival, "everything [the Marketing Department did] was always focused towards getting to the event." [*Id.* at 137:2 – 137:5].

100.    Plaintiff's mentorship of members of the Marketing Department in the weeks leading up the Festival – which had existed prior to the 2016 Festival – was absent in advance of the 2017 Festival. [Parsons Depo. 169:9 – 169:16].

101.    At a Festival, the Marketing Department is predominantly responsible for (a) media relations, including scheduling media appearances and monitoring media on-site at the Festival; (b) directing on-site photographers and videographers; (c) social media coverage and content creation; and (d) accommodating artists and their needs. [Parsons Depo. 137:23 – 138:23].

102.   The Marketing Department is therefore responsible for organizing, prior to a Festival, the matters within its areas of responsibility.  [Parsons Depo. 138:24 – 139:4].  There are "hundreds or thousands" of action items that the Marketing Department executes in advance of a Festival in order to handle its areas of responsibility at a Festival.  [*Id.* at 139:23 – 140:4].

103.   In order to address problems that may arise during the Festival, whoever is coordinating the Marketing Department's efforts must be capable of identifying problems within the Marketing Department's areas of responsibility.  [Parsons Depo. 140:4 – 140:8].  In order to identify when something is not unfolding as planned at a Festival, this person must understand how the Marketing Department *planned* for things to go.  [*Id.* at 140:25 – 141:4].

104.   It is important that whoever is overseeing the Marketing Department's responsibilities at the Festival to be involved in the hundreds or thousands of action items the Marketing Department is executing in advance of the Festival.  [Parsons Depo. 141:16 – 141:23].

105.   Because Byer had been overseeing the Marketing Department's preparation for the Festival in the time leading up to the Festival in which Plaintiff was on medical leave, Gordon also did not want Byer to suddenly lose that responsibility at the time of plan-execution and feel "disempowered."   [*Id.* at 152:5 – 152:17].  Felts further explained as follows in this regard:

> Emily's been running the show. She needs to take ownership for the work that she's done and not let someone take -- you know, to basically shine the light on themselves unnecessarily.

[Felts Depo. 156:16 – 157:4].

106.   Plaintiff was not demoted during or after the 2017 Festival; rather, the decision that Byer should coordinate the Marketing Department's functions and responsibilities *at the Festival* "was merely a realistic assessment of who should do what in the context of the [single]

event." [Gordon Depo. 162:6 – 162:13]. Plaintiff's title and pay did not change. [*Id.* at 162:11 – 162:20].

107.    A few weeks before the Festival, after Plaintiff returned from medical leave, he spent time deciding whether he should even attend the 2017 Festival. He based that decision on whether Byer "would need me there":

Q:    [On August 23, 2017,] were you still looking at dates [for attending the 2017 Festival], what was that about?

A:    Whether or not Emily would need me there. At that point I was just coming back from surgery leave and I didn't want to be in the way if she didn't need me there based on what her and Jason had already had in motion, so, once I –

Q:    And explain that to me. What do you mean?

A:    They were running the department.

[Wingerd Depo. 192:8 – 192:17].

108.    Plaintiff acknowledged at his deposition that KAABOO's decision to place Byer in charge of the Marketing Department's functions at the 2017 Festival was reasonable due to the fact that he had been on leave:

Q:    Did you tell her that was not the way it should be, that you were in charge?

A:    Did I say to Emily Byer this is ridiculous, I should be in charge?

Q:    Right.

A:    No.

Q:    Why not?

A:    Because I had been on leave.

[Wingerd Depo. 199:20 – 200:2].

109.     Within the Marketing Department, Plaintiff considered Byer to be his "equal partner," both "moving towards the same goal." [Wingerd Depo. 177:17 – 177:24].

110.     At the 2017 Festival, Plaintiff told Byer, "you've been up to speed, tell me what you need me to do." [Wingerd Depo. 205:15 – 205:20].

111.     In any event, Earl Parsons perceived no difference between Plaintiff's role at the 2017 Festival and 2016 Festival; Parsons believed <u>Plaintiff</u> managed the Marketing Department at the 2017 Festival. [Parsons Depo. 165:14 – 167:6].

112.     Parsons was a Marketing Coordinator within KAABOO's marketing department. [Parsons Depo. 12:11 – 12:16].

113.     At the 2017 Festival, Plaintiff led morning meetings with his Marketing Department team members and, each evening, told team members what time to report the next morning. [Parsons Depo. 199:16 – 200:7].

114.     Following the 2017 Festival, Plaintiff returned home on September 20. [Wingerd Depo. 218:8 – 218:11].

## VII.   The Marketing Department Misses its Pass Sale Goal for the 2017 Del Mar Festival and Plaintiff is Discharged.

115.     KAABOO missed its pass sale goal for the 2017 Del Mar Festival by a significant margin: 29,990 three-day equivalent passes were sold compared to KAABOO's goal of 43,000. [Wingerd Depo. 212:11 – 213:9; Deposition Exhibit 30].

116.     Prior to the 2017 Festival, on September 11, 2017, Gordon, Felts, and Earnest met to discuss Plaintiff's performance. [Earnest Depo. 70:15 – 70:22]. During that meeting, Gordon and Felts made the decision to terminate Plaintiff's employment. [*Id.* at 83:19 – 83:22, 92:7 – 92:20].

117.   Earnest took contemporaneous notes of what was discussed during the September 11, 2017 meeting.  [Earnest Depo. 58:1 – 58:8, 73:8 – 73:12; Deposition Exhibit 32].

118.   Earnest's notes reflect that the following performance issues, among others, were discussed during the September 11, 2017 meeting:

   a.   Plaintiff's increasingly infrequent communication from January to June 2017;

   b.   That conversion rates for selling passes "hit the skids" because of "extreme clutter on ticketing page";

   c.   Plaintiff's delay in implementing the website re-design;

   d.   That the Marketing Department's presentations at All-Hands Meetings were "getting worse [with] no real substance";

   e.   A projected 10,000-ticket shortfall in pass sales for the 2017 Festival;

   f.   Plaintiff's general failure to govern the Marketing Department;

   g.   Plaintiff's representation that he is working at "100%"; and

   h.   Given the growing demands of the Marketing Department, the need for a manager to be on-site to provide daily "face to face" management "in the corporate office."

[Earnest Depo. 72:16 – 83:22; Deposition Exhibit 32].

119.   Plaintiff was discharged for the following reasons: (a) in two consecutive years, he failed to meet pass sales goals; (b) he did not perform his job responsibilities throughout 2017, which he insisted he could perform; (c) Plaintiff procrastinated and missed deadlines, including in relation to the KAABOO website update, the Street Team, and the Influencer Program; and (d) Plaintiff did not respond to messages from colleagues, rarely communicated with his supervisor and other company leadership, and did not adequately supervise the activities

of the team.  [KAABOO's Answers to Plaintiff's First Set of Interrogatories, Interrogatory No. 2].

120.    Plaintiff was discharged on September 29, 2017 over the telephone, while he was sitting in his living room in Lawrence, Kansas.  [Wingerd Depo. 220:14 – 220:22].

121.    During that telephone call, Felts and Earnest, who performed the termination, were in Denver, Colorado.  [Earnest Depo. 95:11 – 95:19].

122.    During the telephone call terminating Plaintiff's employment, Felts read the following script for the call prepared by Earnest:

> Brian, we have taken a very serious and detailed evaluation of the Marketing department and the performance of the department over the past 2 years and have decided that unfortunately, we need to take a different direction with the senior leadership of the department and we are ending your employment with KAABOO effective immediately.  After a thorough evaluation of the company's needs, we need a leader with deep tactical marketing expertise, as well as someone who is on site in Denver consistently and can travel nationally and internationally on a regular basis.

[Deposition Exhibit 32].

123.    Brian Pilsl was terminated shortly after Plaintiff was terminated, in October 2017.  [Wingerd Depo. 235:8 – 235:12, 237:12 – 238:6].

124.    Throughout his employment with KAABOO, Plaintiff earned a base salary of $130,000.  [A00049-A00051].  Plaintiff was also paid a bonus of $50,000 in January 2017, $48,750 of which was non-discretionary.  [*Id.*; A00539].

125.    KAABOO hired a replacement for the Senior Vice President of Marketing position, who worked a short period of time.  [Gordon Depo. 167:22 – 167:24].

126.    Plaintiff's replacement, Brian Klein, committed at the time he was hired to spending every other week in Denver.  [Gordon Depo. 169:3 – 169:4].

127.    Klein also committed to relocating to Denver following a trial period; moving to Denver immediately would have required Klein to pull his children out of school in the middle of the school year and would have disrupted his family.  [Gordon Depo. 168:21 – 169:11].

128.    KAABOO eliminated the position of Senior Vice President of Marketing, the role formerly held by Plaintiff, effective April 3, 2018.  [Declaration of Earnest, ¶ 6].

**VIII.   Madison Did Not Employ Plaintiff.**

129.    Plaintiff did not work for Madison.  [Gordon Depo. 30:24 – 31:1].

130.    Madison presently employs no employees.  [Earnest Depo. 14:20 – 14:22].

131.    Madison, at no time, has had employees whose job responsibilities included supporting the KAABOO festival.  [Gordon Depo. 24:8 – 24:14].

132.    Madison is an investment firm that sponsored KAABOO's formation and "incubated" its business plan.  [Gordon Depo. 47:23 – 48:21].

133.    Plaintiff signed an offer letter that was drafted on KAABOO's letterhead, and Plaintiff entered various contracts with KAABOO, not Madison.  [Declaration of Earnest, ¶ 9].

134.    Madison never compensated Plaintiff for anything.  [Declaration of Earnest, ¶ 10].

135.    In his employment with KAABOO, Plaintiff provided no services to Madison. [Declaration of Earnest, ¶11].

136.    No person acting in the capacity of an officer, employee, or agent of Madison made any employment decision regarding Plaintiff's employment with KAABOO, including any decisions regarding Plaintiff's job responsibilities or to discharge Plaintiff.  [Declaration of Earnest, ¶ 12].

137.    Madison did not oversee the day-to-day control of Plaintiff's assignments or review the quality of Plaintiff's work product.  [Declaration of Earnest, ¶ 13].

## ARGUMENT AND AUTHORITIES

### I.     Summary Judgment Standards

Summary judgment shall be entered when the evidence shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When a party fails to establish a genuine issue of fact for trial about an element essential to the case for which that party bears the burden of proof, summary judgment should be entered against it. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Where the nonmovant bears the burden of proof at trial, the movant meets its summary judgment burden by either offering evidence that undermines the nonmovant's claim or by merely "pointing out to the *district court*" the absence of evidence supporting at least one essential element of the nonmovant's claim. *Id.* at 323.  If the movant meets its burden, the nonmovant must respond by presenting competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998).  A "mere scintilla of evidence" is not sufficient; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby,* 477 U.S. 242, 252 (1986).  Defendants are entitled to judgment as a matter of law because no material facts are in dispute from which a reasonable jury can find for Plaintiff.

### II.    Plaintiff Cannot Demonstrate Disability Discrimination.

Plaintiff's disability discrimination claim comprises three sub-claims: (1) an alleged failure to accommodate, (2) an alleged demotion, and (3) an allegedly discriminatory discharge. Plaintiff admits, however, that he did not request an accommodation.  He was never demoted. And he was discharged for legitimate, nondiscriminatory reasons relating to his poor performance.  Summary judgment is appropriate.

A.      **Plaintiff Did Not Request an Accommodation**

"[A]s a precondition to suit, employees have the burden to request accommodation unless the employer has 'foreclosed the interactive process through its policies or explicit actions[.]'" *Koessel v. Sublette Cty. Sheriff's Dep't,* 717 F.3d 736, 744 (10th Cir. 2013) (*citing Davoll v. Webb,* 194 F.3d 1116, 1133 (10th Cir. 1999)).   "It is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests."  *Id.* at 745.  Here, Gordon called Plaintiff immediately after learning of Plaintiff's cancer diagnosis and offered whatever assistance KAABOO could provide to assist Plaintiff in performing his job responsibilities while receiving cancer treatment. Plaintiff rejected Gordon's offers to accommodate and insisted that his cancer would not affect his ability to perform his job.  Following that conversation, Plaintiff himself admits that he never identified any accommodation or modification to his job that was necessary due to his cancer diagnosis.  Because Plaintiff did not request accommodation and KAABOO did not foreclose the interactive process, summary judgment is appropriate on Plaintiff's failure to accommodate claim.

Summary judgment is also appropriate on Plaintiff's failure to accommodate claim because Plaintiff's charges of discrimination, filed with the U.S. Equal Employment Opportunity Commission and California Fair Employment and Housing Commission, say nothing about a failure to accommodate disability.  *See Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1186-87 (10th Cir. 2007) (plaintiff did not exhaust claim for failure to accommodate because the EEOC charge did not include factual allegations of any failure to accommodate that would prompt an investigation of such claim); Doc. 5-1, Charge of Discrimination, Exhibit to Amended Complaint.

### B.      Plaintiff Was Not Demoted

Plaintiff's wrongful demotion claim fails because he was never demoted and because, even if Plaintiff's so-called demotion could be characterized as an adverse employment action, KAABOO took such action for a legitimate, non-discriminatory reason.

A *prima facie* case of disability discrimination requires Plaintiff to establish that he suffered an adverse employment action. *Conroy v. Vilsack,* 707 F.3d 1163, 1171, 1181 (10th Cir. 2013). "An adverse employment action constitutes 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Annett v. Univ. of Kansas,* 371 F.3d 1233, 1237 (10th Cir. 2004) (*quoting Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).  "[A] mere inconvenience or an alteration of job responsibilities will not suffice." *Id*. at 1239.  Plaintiff's so-called demotion did not result in any change in employment status, much less a significant one.  His pay, title, benefits, and responsibilities did not change.  Rather, KAABOO simply made the decision that Byer – who had led the Marketing Department's efforts to prepare for the 2017 Del Mar Festival and who had been the direct report for all four Marketing Department employees since January 2017 – would continue leading the Marketing Department's efforts for approximately eight days while on-site at the 2017 Festival.  The decision was not even communicated to the individuals over whom Plaintiff contends he lost authority to manage.  Parsons, for instance, perceived no difference between Plaintiff's role at the 2017 Festival and 2016 Festival, and believed Plaintiff managed the Marketing Department at the 2017 Festival.  Plaintiff continued leading morning meetings with his Marketing Department team members at the 2017 Festival and continued to give them instruction.  Regardless, the individuals over whom Plaintiff contends he lost authority were Byer's direct reports; her continued supervision of them was hardly remarkable.

Furthermore, to the extent Plaintiff could be said to have lost authority over the Marketing Department *at all,* a loss of authority must be "severe or prolonged" in order to constitute an adverse employment action. *Wells v. Colo. Dept. of Transp.,* 325 F.3d 1205, 1214 (10th Cir. 2003) (evaluating whether a loss of authority was "materially adverse" action in more lenient context of retaliation claim); *James v. James,* 129 F. Supp. 3d 1212, 1226 (D. Colo. 2015) (citing *Wells* for proposition that "a loss of authority that was not severe or prolonged is not materially adverse action"); *Tovar v. T-Mobile USA,* No. 05-1213 DJS/RLP, 2006 U.S. Dist. LEXIS 96042, at *7 (D.N.M. Dec. 12, 2006) (same); *Bush v. Mukasey,* No. 04-457 JEC/RS, 2008 U.S. Dist. LEXIS 61952, at *7 (D. Utah Aug. 13, 2008) (same).  At most, Plaintiff alleges that he lost authority of his department for approximately eight days, from the time Plaintiff arrived at the Festival on September 12, 2017 until he left the Festival following its conclusion on September 20, 2017.  This alleged loss was neither severe nor prolonged.

Even if Plaintiff's alleged loss of authority constituted an adverse employment action, KAABOO acted for a legitimate, non-discriminatory reason and Plaintiff cannot demonstrate pretext.  The decision that Byer should lead the Marketing Department's efforts at the 2017 Festival "was merely a realistic assessment of who should do what in the context of the event," and one that Plaintiff acknowledges was reasonable.  While Plaintiff was on leave, Byer led the Marketing Department's efforts to prepare for the Festival.  The Marketing Department's Festival preparations entailed outlining the team's responsibilities, explaining to team members the reasons for everything being done and that will be done, and executing "hundreds or thousands" of action items necessary for the Marketing Department to handle its areas of responsibility at a Festival.  Gordon determined that Byer should manage the Marketing Team's functions at the 2017 Festival for fear that Plaintiff "would have no grounding in . . . what was

planned."  Indeed, in order to address problems that may arise during the Festival, whoever is overseeing the Marketing Department's functions must be capable of identifying problems within the Marketing Department's areas of responsibility.   And in order to identify when something is not unfolding as planned at a Festival, this person must understand how the Marketing Department *planned* for things to go.   Gordon also did not want Byer to feel disempowered after her hard work in managing the Marketing Department's preparation for the Festival.

Plaintiff more than understood why it made sense for Byer to manage the Marketing Department's efforts at the 2017 Festival.  In late August, Plaintiff was still evaluating whether to even go to the Festival based on "whether or not Emily [Byer] would need me there."  And once at the 2017 Festival, Plaintiff told Byer, "you've been up to speed, tell me what you need me to do."

What Plaintiff calls a demotion was a sensible decision about who should fulfill a particular function in the context of a single event.  The decision Plaintiff criticizes now was the same decision he struggled to make in late August 2017 as he decided whether to even attend the 2017 Festival.  He cannot now claim KAABOO's decision is "weak" or "implausible," and he certainly has no evidence that it was.  Summary judgment is appropriate.

### C.   Plaintiff Was Discharged for a Legitimate, Nondiscriminatory Reason and Not Because of His Cancer.

Plaintiff was discharged from his position as Senior Vice President of Marketing for legitimate, non-discriminatory reasons.   Under the *McDonnell Douglas* framework, which governs disability discrimination claims under the ADA, if the plaintiff makes out a *prima facie* case, a burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for the challenged employment action.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502,

507 (1993).  If the employer meets that burden of production, any presumption of discrimination raised by the plaintiff's *prima facie* case disappears.  *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10 (1981).  Then, to survive summary judgment, the plaintiff must demonstrate the employer's articulated rationale is a mere pretext for discrimination.  *Id*. at 253; *Hicks*, 509 U.S. at 507-08.

Plaintiff was discharged for a legitimate, non-discriminatory reason.  He was discharged because: (a) in two consecutive years, he failed to meet pass sales goals; (b) he did not perform his job responsibilities throughout 2017, despite his assurances and insistence that he would do so following his cancer diagnosis; (c) Plaintiff procrastinated and missed deadlines, including in relation to the KAABOO website update, the Street Team, and the Influencer Program; and (d) Plaintiff did not respond to messages from colleagues, rarely communicated with his supervisor and other company leadership, and did not adequately supervise the activities of the team.

Where, as here, an employer advances a number of reasons for an adverse employment action, the Tenth Circuit has "adopted a 'general rule' that 'an employee must proffer evidence that shows each of the employer's justifications is pretextual.'"  *Lobato v. N.M. Env't Dep't,* 733 F.3d 1283, 1289 (10th Cir. 2013) (*citing Bryant v. Farmers Ins. Exch*., 432 F.3d 1114, 1126 (10th Cir. 2005)).  Plaintiff cannot meet his burden.  Plaintiff cannot dispute that he failed to meet pass sales goals in 2016 and 2017.  Plaintiff likewise admits that he rejected any accommodation, even though KAABOO clearly offered to accommodate him.  Despite his insistence on being treated like a "regular guy" with the same job duties and no additional support, Plaintiff unilaterally stopped performing his job: he delegated his job responsibilities to Byer, substantially increasing her workload despite her "already full" plate.  Plaintiff procrastinated and missed deadlines as reflected in contemporaneous emails, which indicate that

Gordon is "hopping f-ing mad," that Gordon believed "nothing about how [the Street Team] has been handled is ok, let alone impressive," and that, later, the Street Team program was "not yet dialed in."  The evidence further demonstrates that Plaintiff secured a website vendor in the last possible moments to do so, and that Plaintiff did next to absolutely nothing to establish an Influencer Program.  The record contains a number of communications to which Plaintiff failed to timely respond.  And Plaintiff, the Senior Vice President of Marketing, admits he made no effort to communicate with Felts, the Chief Marketing Officer.  Although Plaintiff may dispute that Felts was formally his supervisor (even though he was), it is hardly suspicious for a company to assume that the second highest-ranking officer in a department will routinely communicate with the highest-ranking officer in that same department.  Plaintiff admits he began regularly missing telephonic meetings, whether meetings with KAABOO's management or weekly meetings in which he directed members of the Marketing Department.  Plaintiff cannot establish that a single one of KAABOO's reasons for discharging him is a pretext for discrimination, retaliation, or any other unlawful motive.

Plaintiff now, after his employment has ended, attempts to blame a number of his performance failures on the fact that he was receiving treatment for cancer.  The time for him to request an accommodation was *during* his employment.  Plaintiff admits he specifically asked KAABOO to treat him as "a regular guy" who did not have cancer, and further admits that he rejected the open-ended offer of accommodation that KAABOO made.  In *Schmidt v. Safeway, Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994), the Court observed that an "employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it."  But that is precisely what Plaintiff does in this case.  There is no dispute that he delegated his work, communicated significantly less with everybody, and

routinely missed meetings aimed at managing the Marketing Department. He rejected any accommodation, failed to perform the functions of his position, and now asks the Court (rather than his employer) to excuse that lack of performance because of his cancer diagnosis despite his insistence during his employment that his cancer would have no effect on his performance. *See Davila v. Qwest Corp., Inc.,* 113 F. App'x 849, 854 (10th Cir. 2004) ("excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA").

"The ADAAA does not require employers to reasonably accommodate an employee's disability by overlooking past misconduct—irrespective of whether the misconduct resulted from the employee's disability." *Dewitt v. Sw. Bell Tel. Co.,* 845 F.3d 1299, 1316 (10th Cir. 2017). Summary judgment is appropriate.

## III.   Plaintiff Cannot Demonstrate Retaliation in Violation of the ADAAA.

The ADAAA prohibits retaliation against individuals for opposing practices made unlawful under the Act, participating in another's opposition, and for exercising "any right granted or protected" by the ADAAA. 42 U.S.C. § 12203. Few rights are "granted or protected" under the ADAAA, but reasonable accommodation is one of them. 42 U.S.C. § 12112(b)(5). Plaintiff admits he did not request an accommodation and, in fact, rejected KAABOO's attempts to accommodate him.

Plaintiff's admission that he did not request an accommodation is fatal to his retaliation claim. Plaintiff's medical leave – which his pleadings call a protected activity – cannot save this claim. The ADAAA does not specify that employers are required to provide employees with medical leave. A request for medical leave pursuant to a medical leave policy, without more, is not a request for reasonable accommodation. *See Mestas v. Town of Evansville,* No. 17-CV-17-NDF, 2017 U.S. Dist. LEXIS 218676, at *18-19 (D. Wyo. Nov. 21, 2017) (finding "no evidence

that Mestas took any steps to classify his medical leave from November to January as a reasonable accommodation," and rejecting the argument that taking leave necessarily constitutes protected activity under the ADA); *Holmes v. Alive Hospice, Inc.,* No. 3:11-cv-0594, 2015 U.S. Dist. LEXIS 12415, at *15-16 (M.D. Tenn. Feb. 3, 2015) (holding that a Plaintiff's request for medical leave was "not actionable under an ADA claim for retaliation because" a request for medical leave is neither "protected" activity or "opposition"  when the record did not show that Plaintiff's requests for medical leave was accompanied by any kind of complaint or opposition related to disability discrimination).   Reasonable accommodation requires an employer to "consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande v. Wisc. Dep't of Admin*., 44 F.3d 538, 542 (7th Cir. 1995).   Taking leave pursuant to an existing workplace policy, particularly when coupled with Plaintiff's admission that he requested no reasonable accommodation, does not constitute protected activity within the meaning of the ADAAA.

Because Plaintiff cannot establish protected activity, he cannot establish a *prima facie* case of retaliation.  *Foster v. Mountain Coal Co., LLC,* 830 F.3d 1178, 1186-87 (10th Cir. 2016) (elements of a *prima facie* case include protected activity and a materially adverse action).  He also cannot establish a *prima facie* case of retaliatory demotion because, as explained in Section II.B, he was not subjected to a materially adverse action.  *Id.*  And as explained in Sections II.B. and II.C., Plaintiff's discharge and any actions which Plaintiff characterizes as a demotion were taken for legitimate, nondiscriminatory, and non-retaliatory reasons.  Summary judgment is appropriate on Plaintiff's retaliation claim.

## IV.   Plaintiff Cannot Demonstrate Age Discrimination

Plaintiff contends KAABOO demoted and discharged him because of his age in violation of the ADEA.  The validity of Plaintiff's age discrimination claim is belied by the fact that

Plaintiff was forty-five years old when Gordon made the decision to hire him, and there is no evidence that Gordon suddenly developed an aversion to employees in their mid-forties during Plaintiff's two-year tenure with KAABOO. *Chiaramonte v. Fashion Bed Group,* 129 F.3d 391, 399 (7th Cir. 1997) (common actor presumption exists when same decision-maker hires and fires employee in protected class in relatively short time span); *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 175 (8th Cir. 1992) (highly doubtful that person who hires employee in protected age group would fire same employee as result of sudden "aversion to older people").  Beyond that, Plaintiff's age discrimination claims fail for the same reasons as his disability discrimination claims.  Plaintiff's so-called demotion was not a demotion at all, and Plaintiff cannot establish an adverse employment action.  *See* Section II.B.  Even if KAABOO's decision about who would lead the Marketing Department's activities at the 2017 Festival were an adverse action, KAABOO made this decision for a legitimate, nondiscriminatory reason.  *See id.*  KAABOO discharged Plaintiff for a legitimate, nondiscriminatory reason.  *See* Section II.C.  Plaintiff cannot establish that any of KAABOO's proffered reasons for its conduct were a pretext for age discrimination.  Summary judgment is therefore appropriate on Plaintiff's age discrimination claim under the ADEA.

## V.    Plaintiff Was Not Entitled to Overtime Compensation, and his Fair Labor Standards Act Claim Fails.

The Fair Labor Standards Act ("FLSA") exempts from its overtime requirement "any employee employed in a *bona fide* executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).  An employee generally qualifies for the executive exemption if the employee: (1) is paid a salary not less than $455 per week; (2) has a primary duty of management; (3) regularly directs two or more employees; and (4) has "authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing,

advancement, promotion, or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(1)-(4) (2005). A "highly compensated employee," however, is exempt if any one of these elements is satisfied. 29 C.F.R. § 541.601(c). "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." *Id.* The "highly compensated employee" exemption applies to employees whose annual salary exceeds a certain threshold, set at $134,004 for employment after December 1, 2016. 29 C.F.R. § 541.601(b).

In 2017, Plaintiff earned a base salary of $130,000 plus a non-discretionary bonus of $50,000 paid in January 2017. He is a "highly compensated employee." Plaintiff cannot – and does not appear to – dispute that is primary duty was to be "the boss of" Marketing Department and to "be responsible for . . . every function of the department." He therefore easily qualifies as exempt under the second element of the executive exemption: management of a department. Based on his salary, Plaintiff was properly classified as exempt under the executive exemption. Even if Plaintiff's salary were below the "highly compensated" threshold, all of the elements of the executive exemption are satisfied. At all times during his employment, Plaintiff (1) earned compensation in excess of $455 per week; (2) managed the Marketing Department as his primary duty; (3) directed at least two employees, specifically, directly and indirectly, the five employees within the Marketing Department; and (4) had authority to hire or fire employees, or, was capable of making personnel suggestions and recommendations that would have been given particular weight.

Plaintiff does not appear to dispute that, for all but one week of his two years' of employment with KAABOO, he was properly classified as exempt under the executive exemption. Rather, Plaintiff contends that he was allegedly "demoted" on September 11, 2017

and spent the next nine days performing non-exempt work. *See* Amended Complaint, ¶¶ 123-124 ("Upon his September 11, 2017 demotion from management-level responsibilities with defendants, plaintiff became a non-exempt employee under the FLSA."). Plaintiff was not demoted. And, a two-week variation in Plaintiff's job duties cannot cause KAABOO to lose an FLSA exemption. Summary judgment is appropriate on Plaintiff's claim for overtime under the FLSA.

Regulations and DOL guidance regarding the FLSA's executive exemption speak in terms of "customary," "regular," and "primary" job duties – adjectives demonstrating that a variation in job duties, limited to nine days over a two-year course of employment, will not cause an employer to lose the exemption. *See, e.g.,* 29 C.F.R. § 541.700(a) ("The term 'primary duty' means the principal, main, major or most important duty that the employee performs . . . with the major emphasis on the character of the employee's job as a whole."). The Fourth Circuit has addressed whether an employer loses its exemption under the FLSA when administrative employees' job duties changed for a short period of time. *See Counts v. S.C. Elec. & Gas Co.,* 317 F.3d 453 (4th Cir. 2003). In *Counts,* the plaintiffs argued their exempt-status changed when their employer required non-exempt work over a five-week period. *Id.* at 456. The Fourth Circuit cited regulations supporting its finding that "primary duty is meant to be assessed by the totality of the circumstances," and not based on time periods in which job duties may have varied. *Id.* The court ultimately rejected the plaintiffs' argument that five weeks of non-exempt work could strip the defendant of its FLSA exemption when balanced against eighteen months of exempt, administrative work:

> The district court found that the plaintiffs' primary duties were administrative in nature. In doing so, it utilized an eighteen month time frame and found that the performance of nonexempt work for five or six weeks out of every eighteen months could not alter the plaintiffs' exempt status. The use of an eighteen month

framework is not compelled by the regulations. But neither is it without basis. Eighteen months comprises the natural business cycle of the power plant. Assessing employees' duties on the basis of one business cycle is a common sense means of determining the primary duties of those employees. And the district court here correctly determined that plaintiffs' customary and regular tasks are administrative in nature. Plaintiffs are therefore not entitled to overtime pay.

*Id.* at 456-57; *see also Henry v. Quicken Loans, Inc.,* No. 04-CV-40346, 2009 U.S. Dist. LEXIS 90133, at *43 n.14 (E.D. Mich. July 16, 2009) (noting that 29 C.F.R. § 541.700(a) "explicitly adopted the approach used by the Fourth Circuit in *Counts*").

*Counts* cited *Marshall v. Western Union Telegraph Co.*, 621 F.2d 1246 (3d Cir. 1980), describing it as the Third Circuit's rejection of "a similar attempt to import a workweek standard into the short test [for determining proper classification]." In *Marshall*, managerial employees performed job functions normally performed by non-exempt employees during a labor strike. The Third Circuit rejected the use of a workweek standard for determining these employees' exempt status. *Id.* at 1251.

Plaintiff's contention that momentary variations in job duties can change an exempt employee's proper classification, if adopted by the Court, would spell the end of §216(b) collective actions based on employee misclassification. Within any given workforce, there will inevitably be some variation across the day-to-day and week-to-week duties performed by employees with similar job descriptions. Finding that such employees are nevertheless similarly situated for purposes of collective action certification, however, courts routinely hold that such variation does not matter to the ultimate liability question of whether the employees are properly classified as exempt. *See Davis v. Mostyn Law Firm, P.C.,* No. 4:11-cv-02874, 2012 U.S. Dist. LEXIS 6014, at *21-22 (S.D. Tex. Jan. 19, 2012) ("even if paralegals' duties 'vary to some degree from day-to-day and possibly from location to location,' or even from docket to docket, the 'thrust of the job duties,' as established by Plaintiffs' declarations, remains similar");

*Rossello v. Avon Prods.,* No. 14-1815 (JAG/BJM), 2015 U.S. Dist. LEXIS 83388, at \*26-28 (D.P.R. June 24, 2015) ("[The defendant] has not . . . provided any reason to doubt that individual DSMs' jobs, viewed holistically, are sufficiently similar in character to support conditional certification.").   If job responsibilities over a nine-day span within two years' of employment (less than one percent of the whole) can render an otherwise admittedly exempt employee non-exempt, then collective action allegations will no longer have a place in FLSA misclassification cases.

Plaintiff's base salary and non-discretionary bonus totaled $178,750 in 2017.   Plaintiff's primary duty was management of KAABOO's Marketing Department, he supervised, both directly and indirectly, five employees, and he had the ability to make personnel decisions and suggestions that were given particular weight.   He was properly classified as exempt under the FLSA and was not entitled to overtime.   Count IV of his Amended Complaint fails.

## VI.   The Court Should Not Apply California Law, But Plaintiff's Wrongful Discharge Claim Based on California Law Would Fail Regardless.

### A.   Kansas Choice of Law Rules Dictate that Kansas, Not California, Law Applies to Plaintiff's Wrongful Discharge Claims.

Plaintiff was discharged over the telephone as he sat in his living room in Lawrence, Kansas.   He has lived in Lawrence ever since, and presumably has suffered the damages he claims in this lawsuit within the State of Kansas.   Because there is no basis for asking the Court to apply California law under Kansas choice of law rules, summary judgment is appropriate on the wrongful discharge claims Plaintiff brings under California law.

A federal court applies the substantive law, including choice of law rules, of the forum state. *Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1104 (10th Cir. 1999); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Under Kansas choice of law rules, the party seeking to apply a different state's law has the

burden of making a "clear showing" for its application.  *Howard v. Ferrellgas Partners, L.P.,* 748 F.3d 975, 982 (10th Cir. 2014).  In cases of doubt, "the law of the forum is preferred."  *Phil. Am. Life Ins. v. Raytheon Aircraft Co.,* 252 F.Supp.2d 1138, 1142 (D. Kan. 2003); *see also Sys. Design & Mgmt. Info. Inc. v. Kan. City Post Office Emps. Credit Union,* 14 Kan. App.2d 266, 269, 788 P.2d 878 (1990).

Claims pursuant to a non-forum state's statutory law can be subject to dismissal based on a choice of law analysis.  *See, e.g., Kelly v. Quotron Sys., Inc.,* No. 91 Civ. 5408 (WK), 1993 U.S. Dist. LEXIS 4602, at *5 (S.D.N.Y. Apr. 8, 1993) (dismissing the plaintiff's FEHA claims because the "impact of the wrong" was felt in New York); *Burnside v. Simpson Paper Co.,* 123 Wash. 2d 93, 95, 864 P.2d 937, 938 (1994) (applying conflict analysis to decide whether FEHA or Washington's discrimination law applied); *Andy's Towing, Inc. v. Bulldog Building Systems, Inc.,* 2011 U.S. Dist. LEXIS 63061, 2011 WL 2433679 *5-6 (D. Kan. June 14, 2011) (performing choice of law analysis to determine whether Oregon or Kansas consumer fraud statutes should be applied); *Campbell v. Prometheus Labs., Inc.,* No. 3:07-0558, 2008 U.S. Dist. LEXIS 6359, at *21 (M.D. Tenn. Jan. 28, 2008) ("Plaintiff has not cited any case recognizing the authority of a federal district court outside of California to apply California's FEHA to one who is not a California resident.").

A choice of law analysis is appropriate if there is a material difference between the two choices of law.  Differences in the availability of punitive damages – for instance, where one state caps damages and one does not – are material.  *DC3 Entm't, Ltd. Liab. Co. v. John Galt Entm't, Inc.,* No. C04-2374C, 2006 U.S. Dist. LEXIS 24944, at *27-28 (W.D. Wash. Feb. 2, 2006) ("In contrast to California's allowance of punitive damages, under the law of Washington, 'punitive damages are not allowed unless expressly authorized by the legislature.'"); *Iskowitz v.*

*Cessna Aircraft Co.,* No. 07-cv-00968-REB-CBS, 2010 U.S. Dist. LEXIS 88791, at *12-13 (D. Colo. Aug. 5, 2010) ("Colorado's inflation adjustment, which has been effective over a period of several years, effectively has raised the amount of Colorado's cap on non-economic damages by a significant amount. This difference in the amount of the cap potentially is outcome determinative in this case."); *In re Air Crash near Clarence Ctr.,* 798 F. Supp. 2d 481, 486 (W.D.N.Y. 2011) ("Virginia caps total punitive damages at $350,000; New York has no cap. . . . There is thus an actual conflict of laws.").

There are obvious differences between the California Fair Employment and Housing Act and the California common law cause of action for wrongful discharge, and their Kansas law counterparts.   Under FEHA and the California common law, punitive and compensatory damages are not capped.  *See, generally, Roby v. McKesson Corp.* (2009) 47 Cal. 4th 686, 101 Cal. Rptr. 3d 773, 219 P.3d 749.   Under the Kansas Act Against Discrimination ("KAAD"), compensatory damages are capped at $2,000 and punitive damages are not available.  K.S.A. 44-1005(k); *Woods v. Midwest Conveyor Co.,* 231 Kan. 763, 771-72 (1982).   Under California common law, a tort cause of action is available when an employee is discharged in violation of a statute.  *See, e.g. Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 176, 164 Cal. Rptr. 839, 610 P.2d 1330.   Under Kansas law, a tort cause of action is available in only limited circumstances (such as when an employee reports a violation of the law or when an employee files a worker's compensation claim) and is precluded when the employee has a statutory remedy (such as, as applicable here, KAAD).  *Chapman v. Atchison Casting Corp.,* No. 99-2094-KHV, 2000 U.S. Dist. LEXIS 21034, at *9 (D. Kan. Sep. 25, 2000) ("Since the KADEA is based on the structure of the KAAD, it follows that it too provides adequate remedies."); *U.S. ex rel. Feaster v. Dopps Chiropractic Clinic, LLC,* No. 13-1453-EFM-KGG, 2015 U.S. Dist. LEXIS 150321, at

*34 (D. Kan. Nov. 5, 2015) ("To the alternative extent that Feaster claims retaliation under Kansas common law for opposing discriminatory conduct unlawful under § 1981, Title VII, and KAAD, those statutes provide adequate alternative remedies."). Based on these material differences between California and Kansas law, a choice of law analysis is appropriate. *See, e.g., McCormack v. Medcor, Inc.,* No. 14 CV 3551, 2014 U.S. Dist. LEXIS 155955, at *6-7 (N.D. Ill. Nov. 3, 2014) (finding material differences in law where the plaintiff "concedes that she could not file her [California] common law tort claim for discriminatory discharge in Illinois").

In tort cases,[1] Kansas follows the traditional rule of *lex loci delecti. Andy's Towing,* 2011 U.S. Dist. LEXIS 63061, at *14-15 (*citing Thompson v. Jiffy Lube Intern., Inc.,* 250 F.R.D. 607, 627 (D. Kan. 2008)). "Under this rule, the court will determine the 'place of the wrong' and apply the substantive law of that State." *Id.* "Kansas courts typically consider the 'wrong' to be the place where the injury was sustained rather than where the tortious act took place." *Id.* (citing *Ling v. Jan's Liquors,* 237 Kan. 629, 634, 703 P.2d 731, 735 (1985); *Hermelink v. Dynamex Operations East, Inc.,* 109 F.Supp.2d 1299, 1303 (D. Kan. 2000) (in a tort action, "[w]hen a plaintiff alleges financial injury, the court looks to the law of the state in which the plaintiff felt that financial injury"). "Generally, the place of the injury is obvious, and it is easy to determine which state's law applies." *Andy's Towing,* 2011 U.S. Dist. LEXIS 63061, at *14-15. In *Ling,* for instance, the Kansas Supreme Court held that Kansas law applied when defendant sold alcohol to a minor in Missouri but plaintiff was injured in an automobile accident in Kansas. 237 Kan. at 634.

---

[1] This choice of law test applies to causes of action that more "resemble" tort actions than contract actions. *Anapoell v. Am. Express Bus. Fin. Corp.,* No. 2:07-CV-198-TC, 2007 U.S. Dist. LEXIS 88182, at *36-37 (D. Utah Nov. 29, 2007) (collecting cases).

Here, the place of injury is obviously Kansas.  In *Aiken v. Emp'r Health Servs.,* No. 95-3196, 1996 U.S. App. LEXIS 6060, at *7 (10th Cir. Mar. 26, 1996), the Tenth Circuit held that under *lex loci delicti*, the law of the state in which the employee learned of the discharge applies because it was the last event necessary to impose liability.  Plaintiff learned about his discharge in Kansas.  In addition, Plaintiff suffered any of his claimed injuries in Kansas where he lived at the time of his discharge and continues living today.  Kansas law applies in this case.  California law does not.  Plaintiff's wrongful discharge claims based on California law should be dismissed.

## B.    Extraterritorial Application of California Law

Because *lex loci delecti* dictates that Plaintiff's wrongful discharge claims must be governed by Kansas law, it is not necessary for the Court to determine whether Plaintiff's claims under FEHA and California common law can apply extraterritorially as a matter of statutory interpretation and California public policy.  If it were necessary however, summary judgment is appropriate on Plaintiff's wrongful discharge claims under FEHA and California common law because these causes of action do "not apply to non-California residents employed outside of California, even if the employer is a California-based company [which defendants here are not]." *Oxford v. Linc Grp., Inc.,* 724 F. Supp. 2d 570, 574 (E.D.N.C. 2010).

Under California law, state statutes are ordinarily not given extraterritorial effect and are therefore presumed not to apply extraterritorially. *North Alaska Salmon Co. v. Pillsbury* (1916) 174 Cal. 1, 4.  Therefore, FEHA does not apply to nonresidents "employed outside the state, when the tortious conduct did not occur in California." *Campbell v. Arco Marine, Inc.*, 42 Cal. App. 4th 1850, 1860 (1996). *Campbell* cited the legislative history of FEHA, which indicates in its legislative findings its intent to protect "the public welfare, prosperity, health, and peace of the people of the State of California." *Id.* at 1859-60.  FEHA does not apply to discrimination claims when the place of employment is outside California. *See Guillory v. Princess Cruise*

*Lines,* No. B192233, 2007 Cal. App. Unpub. LEXIS 353, at *12-16 (Jan. 17, 2007) (*citing Cleary v. United States Lines, Inc.,* 728 F.2d 607, 610 (3d. Cir. 1984)); *see also Sullivan v. Oracle Corp.,* 51 Cal. 4th 1191, 1208, 127 Cal. Rptr. 3d 185, 199, 254 P.3d 237, 248-49 (2011) (because, "for an employer to adopt an erroneous classification policy is not unlawful in the abstract," the fact that the employer's "decision to classify [the plaintiffs] as exempt was made in California does not, standing alone, justify applying [a California statute] to the nonresident[s]").

Plaintiff was a Kansas resident.  His place of employment was Kansas.  He was discharged while sitting in his living room in Kansas.  His employer is based in Colorado and was in Colorado when informing him of the discharge.  FEHA and California common law do not apply extraterritorially to Plaintiff discharge.

### C.    Plaintiff's California Law Claims Fail on the Merits.

Even if Plaintiff's claims based on California law survived a choice of law analysis, and even if they could be applied extraterritorially to a discharge that occurred outside California, they fail for the same reasons as Plaintiff's claims based on federal discrimination laws. *Johnson v. City & Cty. of S.F.,* No. 16-cv-02913-SI, 2017 U.S. Dist. LEXIS 166377, at *12 n.7 (N.D. Cal. Oct. 6, 2017) (*quoting Humphrey v. Memorial Hospitals Ass'n,* 239 F.3d 1128, 1133 n.6 (9th Cir. 2001), as follows: "Because the FEHA provisions relating to disability discrimination are based on the ADA, decisions interpreting federal anti-discrimination laws are relevant in interpreting the FEHA's similar provisions."); *Williams v. Lorenz,* No. 15-cv-04494-BLF, 2018 U.S. Dist. LEXIS 142967, at *20 (N.D. Cal. Aug. 22, 2018) ("The *McDonnell Douglas* burden-shifting framework applies to Title VII, ADEA, and FEHA claims.").  Plaintiff was not demoted, he did not engage in protected activity, and any actions that KAABOO took were for legitimate,

non-discriminatory, and not-retaliatory reasons.  *See supra.*  Summary judgment is appropriate on Plaintiff's claims based on California law.

## VII.    Madison Was Not Plaintiff's Employer and Cannot be Liable for Any of Plaintiff's Claims.

### A.    Madison Did Not Employ Plaintiff for Purposes of His ADAAA and ADEA Claims.

"The plaintiff in an employment discrimination case carries the burden of establishing that the defendant was his employer."  *See Florez v. Holly Corp.,* 154 Fed. Appx. 707 (10th Cir. 2005) (*citing Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1071 n.2 (10th Cir. 1998)).  A strong presumption exists that one company is not the employer of another company's employees, "and the courts have found otherwise only in extraordinary circumstances."  *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir. 1993).  The Tenth Circuit employs two different tests to determine employment when an employee of one entity seeks to hold another entity liable under federal discrimination laws: the joint employer test and the single employer test.  *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225-26 (10th Cir. 2014) (*citing Bristol v. Bd. of Cty. Comm'rs of Cty. of Clear Creek,* 312 F.3d 1213, 1218 (10th Cir. 2002)).  Because resolution of neither test suggests Madison employed Plaintiff, summary judgment is appropriate on his ADAAA and ADEA claims against Madison.

The joint employment test "acknowledges that the two entities are separate, but looks to whether they co-determine the essential terms and conditions of employment."  *Bristol,* 312 F.3d at 1218.  To hold entities liable as joint employers, they both must exercise significant control over the terms and conditions of a worker's employment.  *Knitter,* 758 F.3d at 1226 (*citing Bristol,* 312 F.3d at 1218; *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1330 (10th Cir. 2002)).  The most important aspect of control over the terms and conditions of employment "'is the right to terminate it [.]'"  *Id.* (*quoting Bristol,* 312 F.3d at 1219).  "Additional factors

courts consider for determining control under the joint employer test include the ability to 'promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; . . . day-to-day supervision of employees, including employee discipline; and . . . control of employee records, including payroll, insurance, taxes and the like.'" *Id.* (*quoting Butterbaugh v. Chertoff,* 479 F. Supp. 2d 485, 491 (W.D. Pa. 2007)).

Plaintiff presents no evidence supporting any of these factors.  KAABOO – not Madison – hired Plaintiff in October 2015.  KAABOO paid Plaintiff's salary, Plaintiff signed an offer letter that was drafted on KAABOO's letterhead, and Plaintiff entered various contracts with KAABOO.  Madison never compensated Plaintiff for anything.  In his employment with KAABOO, Plaintiff provided no services to Madison.  No person acting in the capacity of an officer, employee, or agent of Madison made any employment decision regarding Plaintiff's employment with KAABOO, including any decisions regarding Plaintiff's job responsibilities or to discharge Plaintiff.  At no time did Madison oversee the day-to-day control of Plaintiff's assignments or review the quality of Plaintiff's work product.  In short, Madison exercised no control over Plaintiff.  As a matter of law, Plaintiff cannot establish that Madison was his employer under the joint employment test.

Under the "single employer" test, the predominant inquiry is whether the putative employer "exercise[s] a degree of control that exceeds that normally exercised by a parent corporation." *Florez v. Holly Corp.,* 154 Fed. Appx. 707 (10th Cir. 2005) (*citing Lockard,* 162 F.3d at 1071 n.2); *see also Tatum v. Everhart,* 954 F. Supp. 225, 229 (D. Kan. 1997) ("To establish centralized control, the parent corporation's control of the day-to-day employment decisions of the subsidiary must be shown.").  For that reason, no court has ever applied the single employer test to hold a corporate affiliate liable for employment claims brought by an

employee of a dominant corporation. Here, it is undisputed that Shawnna Earnest performed the human resources function for both Madison and KAABOO. At all times relevant, however, Earnest was an employee of KAABOO. Throughout 2017, Madison had between four and eight employees and now has no employees. KAABOO currently has approximately fifty employees and had approximately 35 employees in 2017. If Madison can be liable to a KAABOO employee merely because a KAABOO officer performed Madison's human resource function, then each and every subsidiary of a parent could be proper defendants in employment cases brought by the parent's employees. This cannot be the law. KAABOO employees performed certain functions for Madison, not vice versa, and it is therefore unclear why Plaintiff believes Madison should be liable in this case.

When applying the "single employer" test, courts "generally weigh four factors: '(1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control.'" *Knitter*, 758 F.3d at 1227 (*quoting Bristol*, 312 F.3d at 1220). Of the factors within the single employer test, "[t]he third factor is considered to be highly determinative." *Florez*, 154 Fed. Appx. 707 (*citing Bristol*, 312 F.3d at 1220); *Skidmore v. Precision Printing & Packaging, Inc.,* 188 F.3d 606, 617 (5th Cir. 1999) (noting that courts have focused almost exclusively on the third factor). "The critical question is, what entity made the final decisions regarding employment matters relating to the person claiming discrimination?" *Frank*, 3 F.3d at 1363 (further quotation omitted). Here, there is no evidence that Madison made any decisions regarding employment matters relevant to Plaintiff. And Plaintiff certainly cannot make a sufficiently strong showing on the remaining single-employer factors to overcome his complete lack of evidence supporting the most important – often exclusive – factor. There is no basis for holding Madison liable in this lawsuit.

**B.      Madison Did Not Employ Plaintiff for Purposes of His FLSA Claim.**

Under the economic realities test applicable to FLSA claims, Plaintiff's overtime claim fares no better.  "[T]he focal point [of the economic realities test] is 'whether the individual is economically dependent on the business'" in question.  *Henderson v. Inter—Chem Coal Co., Inc.*, 41 F.3d 567, 570 (10th Cir. 1994).  Plaintiff is not economically dependent on Madison: Madison never paid him anything and he never performed a single service for the benefit of Madison.  Madison lacked the power to hire and fire Plaintiff, supervise or control him, determine his rate or method of payment, or maintain his employment records.  *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990).  To the contrary, Plaintiff was hired when he signed an offer letter that appeared on KAABOO's letterhead, entered various contracts with KAABOO, was supervised by individuals acting in their capacities as officers of KAABOO, and was paid by KAABOO according to terms he and KAABOO agreed upon.  Earnest – a KAABOO employee – maintained personnel records regarding Plaintiff and joined Jason Felts – a KAABOO partner – on a phone call in which Plaintiff was informed of his discharge.  Nothing about the economic realities of Plaintiff's employment suggests Plaintiff was employed by Madison.

**C.      Madison Did Not Employ Plaintiff For Purposes of California Law.**

Plaintiff's claims against Madison under California law (if this Court deems it applies) likewise fail.  California courts analyze the joint employer test based on a totality of the circumstances, but the most important factor is the extent of the alleged joint employer's right to control the means of the employee's performance.  *Poehls v. ENSR Consulting & Eng'g, No. CV 04-8885 MMM (SHx)*, 2006 U.S. Dist. LEXIS 102873, at *67 (C.D. Cal. Aug. 28, 2006) (*quoting Vernon v. State of California*, 116 Cal.App.4th 114, 121-124 (2004)).  The employer must

possess "actual control over the [individual's] access to the job market."  *Vernon*, 116 Cal.App.4th at 121-124 (2004).  Other relevant factors under the joint employer test are similar to those described above under the ADAAA and ADEA, including "payment of salary and other employment benefits; ownership of the equipment necessary to perform the job; the location of the job; the defendant's obligation to train the employee; defendant's authority to hire, transfer, promote, discipline, or discharge the employee; the authority to establish work schedules and assignments; defendant's discretion to determine the employee's compensation; and whether the work is part of defendant's regular business operations."  .  *Id.*

Just as under the joint employer test for both the ADAAA and the ADEA, Plaintiff cannot offer *any* evidence that Madison exercised control over him.  At no time did Madison control Plaintiff's day-to-day work assignments, schedule, or terms of employment.  Madison also did not pay Plaintiff's salary, determine his compensation, or have anything to do with the economic aspects of Plaintiff's employment with KAABOO.  Again, as a matter of law, Plaintiff cannot establish that Madison was a joint employer.

### D.   Madison Does Not Employ a Sufficient Number of Employees to be Subject to Plaintiff's Claims.

Madison currently has no employees and, throughout 2017, had between four and eight employees.  An employer must have at least fifteen employees to be covered by the ADAAA. 42 U.S.C. § 12111(2).  An employer must have twenty employees to be covered by the ADEA. 29 U.S.C. § 630(b).  Because Madison had, at most, eight employees at any relevant time, summary judgment in its favor is appropriate on Plaintiff's ADAAA and ADEA claims.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Defendants respectfully request the Court

enter an Order granting summary judgment in their favor.

/s/ Alan L. Rupe
Alan L. Rupe, #08914
Jason D. Stitt, #22216
LEWIS BRISBOIS BISGAARD & SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, Kansas 67206
Telephone: (316) 609-7900
Facsimile:  (316) 462-5746
alan.rupe@lewisbrisbois.com
jason.stitt@lewisbrisbois.com

*Attorney for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2018, the foregoing was filed electronically using the
court's electronic filing system which will send notice to all counsel of record in this case.

/s/ Alan L. Rupe
Alan L. Rupe