## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BRIAN WINGERD,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 18-CV-2024-JAR-KGG** |
| **KAABOOWORKS SERVICES, LLC,** **and THE MADISON COMPANIES, LLC,** | |
| **Defendants.** | |

## MEMORANDUM & ORDER

Plaintiff Brian Wingerd brings this action against Defendants Kaabooworks Services, LLC ("KAABOO") and the Madison Companies, LLC ("Madison"), alleging claims of disability discrimination and retaliation under the Americans with Disabilities Act as Amended ("ADA"), age discrimination under the Age Discrimination in Employment Act ("ADEA"), failure to pay overtime in violation of the Fair Labor Standards Act ("FLSA"), unlawful termination, demotion, and retaliation under the California Fair Employment and Housing Act ("FEHA"),[1] and wrongful demotion and termination in violation of California public policy.  Wingerd has elected not to pursue his age discrimination claim at trial.[2]

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 117).  For the reasons stated in this opinion, the Court **grants** summary judgment on Wingerd's ADEA, FLSA, and state law wrongful termination claims (Counts III, IV, VI, VIII, and X), **denies** summary judgment on Wingerd's ADA disability discrimination and retaliation claims

---

[1] Cal. Govt. Code §12940(a) *et seq*.

[2] Doc. 128, p. 112.

and state law wrongful demotion claims (Counts I, II, V, VII, and IX), and **denies** summary judgment on the issue of Madison's liability.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[3] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[5]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[8]  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's

---

[3] Fed. R. Civ. P. 56(a).

[4] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[5] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[6] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[8] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[9]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[13]  To successfully oppose summary judgment, the nonmovant must bring forward "more than a mere scintilla of evidence" in support of his position.[14]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[15]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[16]

---

[9] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[10] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[11] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[12] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71); *see Kannady*, 590 F.3d at 1169.

[13] *Adler*, 144 F.3d at 671.

[14] *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).

[15] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[16] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## II.   Evidentiary Issues

Defendants ask the Court to strike and disregard the portions of Wingerd's affidavit in which he states that he requested an accommodation, arguing that the portions constitute a "sham" affidavit because the statements contradict Wingerd's deposition testimony.

"[A]n affidavit may not be disregarded [solely] because it conflicts with the affiant's prior sworn statements.  In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue."[17]  In determining whether an affidavit creates a sham issue, the Tenth Circuit directs district courts to consider whether "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."[18]  The Tenth Circuit "explicitly require[s] that a district court first 'determine whether the conflicting affidavit is simply an attempt to create a "sham fact issue" before excluding it from summary judgment consideration.'"[19]

In addition, Fed. R. Civ. P. 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  "Though an affidavit which fails to meet any of the three requirements is subject

---

[17] *The Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

[18] *Id.*

[19] *Id.* (quoting *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1010 n.2 (10th Cir. 1992) (quoting *Franks*, 796 F.2d at 1237)).

to a motion to strike, the [c]ourt may also enforce the rule by disregarding portions of the affidavit it finds insufficient."[20]  "Conclusory and self-serving affidavits are not sufficient."[21]

In his deposition testimony, Wingerd testified that "he did not ask for any accommodations."[22]  Conversely, Wingerd's affidavit states, "when I testified in my deposition that I had not asked for an accommodation, I did not understand the legal meaning of the term 'accommodation' as it is defined within the context of the Americans with Disabilities Act."[23] The Court finds that this statement properly attempts to explain confusion in the deposition testimony.

The record shows that Wingerd (1) participated in company meetings via telephone, which both Bryan Gordon and Jason Felts labeled as an accommodation; (2) created a bandwidth plan and delegated his work to other marketing department employees; (3) took time off for cancer treatments and related illness; (4) and took a six-week medical leave for cancer surgery. The relevant facts supporting Wingerd's accommodation claim are properly presented to the Court, and Wingerd's affidavit does not conflict with their substance.  Whether Wingerd called these actions "accommodations" in deposition testimony after the alleged accommodations occurred is not dispositive.[24]  Therefore, the Court denies Defendants' motion to strike.

---

[20] *City of Shawnee, Kan. v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1177 (D. Kan. 2008) (internal quotation and citations omitted).

[21] *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)).

[22] Docs. 118-5 at 233:10–13; 128-2 at 198:8–22.

[23] Doc. 128-3 ¶ 47.

[24] *See Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) (en banc) ("To request accommodation, an individual may use plain English and need not mention the ADA or use the phrase 'reasonable accommodation.'").

III.     **Uncontroverted Facts**

The following facts are either uncontroverted or viewed in the light most favorable to

Wingerd.

A.       **The Parties**

KAABOO is a "Colorado-based live music and entertainment company" that provides

management, employment and contracting services primarily to companies operating live music

and culture events.[25]  KAABOO's primary services relate to the Del Mar Festival, which has

been held annually since September 2015.  KAABOO is a Delaware limited liability company

and maintains its principal administrative offices in Colorado.  As of September 29, 2017,

KAABOO had thirty-five to forty employees.  Madison is a Delaware limited liability company

and maintains its principal administrative offices in Colorado, at the same location as

KAABOO's principal administrative offices.

Madison's equity members are also active equity members of KAABOO.  Bryan Gordon

is the Chairman and Chief Executive Officer of KAABOO and the Managing Director of

Madison.  Shawna Earnest is the Senior Vice President of Human Resources at both KAABOO

and Madison.  When Wingerd took medical leave, it was tracked on workforcenow.adp.com,

which includes Madison's logo on the webpage,[26] although a KAABOO employee, Jill Sulser,

created the webpage.  When Earnest communicated with Wingerd about the disability policy

governing his medical leave, she did so from her @madisoncos.com email address.[27]  Wingerd

and other employees received email communications related to KAABOO employment

---

[25] Doc. 126-1 at 4.

[26] Doc. 128-63.

[27] Doc. 128-73 at 6.

responsibilities and services from the @madisoncos.com domain.[28]  Wingerd's January 2017 quarterly review was entitled "The Madison Companies, LLC Quarterly Review."[29]

Madison incubated KAABOO and considers KAABOO its featured investment, shares its only office with KAABOO, and shares human resource professionals with KAABOO.  Some of KAABOO's documents, including legal contracts, are "kept in Madison's Citrix Environment," an online digital storage platform.[30]  KAABOO's employees provide some services to Madison, for which Madison reimburses KAABOO, including services at the annual Del Mar festival.

Brian Wingerd is a resident of Lawrence, Kansas.  Although Wingerd worked primarily from his home in Kansas, his primary job focus was marketing the Del Mar Music Festival, which took place in Del Mar, California.  Wingerd, along with his business partner Brian Pilsl, initially provided services for the 2015 Del Mar Festival through his company, Sprocket Marketing.  Following the 2015 festival, he received an offer of employment bearing a KAABOO logo via U.S. mail, which he accepted on a telephone call with Gordon on October 2, 2015.  Wingerd was hired as the Senior Vice President of Marketing, and Gordon was his direct supervisor; Gordon reviewed and directed Wingerd's day-to-day work.  When Gordon recruited Wingerd for employment, he described Madison as the employer and KAABOO as the project.  Pilsl, who went to work for  KAABOO as its Senior Vice President of Business Development, testified that he understood "KAABOO was one of the portfolio properties of Madison."  Pilsl received instructions to use the Madison FedEx account to ship goods, store documents on the

---

[28] *See, e.g.*, Docs. 128-73, 126-14.

[29] Doc. 128-64.

[30] Doc. 151-5 at 18:2–6, 19:1–9.

Madison Citrix Environment, and was told by Gordon that "if KAABOO doesn't work out, you'll always have a place at Madison."[31]

### B.     Wingerd's Diagnosis and Accommodations

Wingerd was diagnosed with terminal kidney and liver cancer on November 15, 2016. When Wingerd informed Gordon about his diagnosis, Gordon told him that KAABOO and Madison would support his fight against cancer, even if it became necessary for Wingerd to take a diminished role.  Gordon instructed Wingerd "to not overdo it, to ask for help, to ensure that health came first,"[32] and to relax, focus on his health, and "let go of the reins."[33]  Jason Felts, KAABOO's Chief Brand and Marketing Officer, reiterated the sentiment.  In March 2017, Felts told Wingerd to make family a priority and encouraged him to "dip out, go off grid" if needed.[34]

The terms of Wingerd's employment required occasional travel.  Although Wingerd asked about and was eager for international travel, Defendants never sent Wingerd on international travel.  Prior to his diagnosis, Wingerd traveled to Denver approximately every other week, as well as to California periodically to promote the festival.  Wingerd never told Defendants that his illness prevented regular travel, and they did not ask him about his ability or willingness to travel following his surgery.  Wingerd could travel except to the extent travel occasionally conflicted with cancer treatments.  Indeed, he traveled to California and worked over 120 hours during the 2017 festival, despite having major surgery about ten weeks prior. Wingerd testified that he "would have traveled much more during 2017 if Bryan Gordon had not

---

[31] Doc. 126-2 ¶ 3.

[32] Doc. 128-2 at 234:16–235:4.

[33] Doc. 128-3 ¶ 49

[34] Doc. 128-8 at 101:1–102:25.

told me that travel [for meetings] was unnecessary."[35]  Gordon told Wingerd he should

participate in company meetings via telephone.[36]  Felts was not privy to this conversation, but

viewed the telephone participation as an accommodation.[37]

Wingerd stated that he did not want to be treated like a "cancer patient," that he wanted to

be treated like "everybody else," and testified that "he did not ask for any accommodations."[38]

However, Wingerd was permitted to participate in company meetings via telephone and Wingerd

created a "bandwidth plan" at Gordon's direction to "provide assistance to him."[39]  Other

marketing department employees "knew [Wingerd] was going to be working less while he was

getting treatment"[40] and were expected to assist with Wingerd's "bandwidth" or take on extra

work when necessary.[41]  Wingerd relied on the marketing team when his health made it

necessary.  He took time off to undergo chemotherapy, when he was in the emergency room with

pneumonia, and for travel and treatment at MD Anderson.  During that time, Wingerd "leaned on

Emily [Byer] more" and "delegate[ed] more to her that [he] would have naturally taken on

[himself]."[42]  Byer estimates that her workload increased by ten to twenty percent at first, and

then by fifty percent when Wingerd was on medical leave.[43]  Byer helped "keep the ship afloat"

and asked Wingerd what she could "take on" to help after his diagnosis.[44]

---

[35] Doc. 128-3 ¶ 6.

[36] Doc. 128-1 at 85:5–13 ("[O]ne immediate accommodation was . . . that [Wingerd] wouldn't be able to travel.").

[37] Doc. 128-8 at 177:6–17.

[38] Docs. 118-5 at 233:10–13; 128-2 at 198:8–22.

[39] Doc. 128-1 at 126:25–127:9.

[40] Doc. 128-5 at 58:2–17.

[41] Id.; Docs. 128-6 at 73:1–74:3; 128-4 at 67:2–15.

[42] Doc. 118-5 at 234:16–21, 248:5–13.

[43] Doc. 118-6 at 127:15–128:5.

[44] Doc. 128-4 at 67:7–9, 65:9–16.

Wingerd missed a small number of meetings because of medical appointments or cancer treatments, including senior management calls and weekly marketing department meetings. Wingerd's phone records reflect that he participated in sixty-four telephonic conferences on Defendants' conference call line in 2017.[45]  Many of the meetings were arranged on an ad hoc basis, and weekly marketing department were scheduled as-needed.

### C.       2017 Del Mar Festival and Demotion

In June 2017, Felts began working directly with Byer on Marketing Department decisions.  Byer asked to bring Wingerd in the loop, but Felts replied that he did not want to bring him in yet.[46]  Wingerd had major abdominal surgery on July 6, 2017, and was on medical leave for six weeks following the surgery.

Wingerd began planning his travel to Del Mar for the festival while he was on medical leave; he planned to arrive on September 12.  Byer communicated Wingerd's plans to Gordon, Felts, and Earnest no later than August 17, 2017.[47]  Immediately after learning that Wingerd intended to participate in the festival, Gordon expressed concern and set up a meeting to discuss Wingerd.[48]

Following his medical leave, Wingerd returned to work—remotely from his home in Lawrence—on or around August 21, 2017.  His physical appearance had changed from cancer-related treatments and surgery: he had lost significant weight and appeared gaunt, pale, and unhealthy.  However, he was fully capable of performing all his job responsibilities, and oversaw the push to increase ticket sales after he returned from medical leave.

---

[45] Doc. 126-9.

[46] Doc. 128-4 at 73:12–75:5.

[47] Doc. 126-8.

[48] Doc. 128-58.

On the evening prior to Wingerd's arrival at the festival, Felts wrote Gordon and Earnest:

> I have a specific plan for him for this weekend. I briefed [Byer] on
> it and having him handle a few specific tasks. It starts with a mtg
> with him and I tomorrow the second he hits the grounds before he
> goes into the festival office. Really need his being here not to be a
> distraction. He's onboard to meet me on arrival to pre brief. Will
> fill you guys in tomorrow.[49]

Felts plan was not communicated to Wingerd prior to the festival.  Felts testified that prior to the

festival, he briefed Byer that "we needed to have some specific tasks that [Wingerd] could do,

because he obviously couldn't just jump right into running the entire department."[50]  Gordon

testified he instructed Felts to limit Wingerd's role because Wingerd "would have no grounding.

. . [in] what was planned."[51]  In 2016, Wingerd created a Marketing Department plan that

detailed the team's "day-to-day" operations to ensure "on-site execution."[52]  The Marketing

Department used Wingerd's plan for the 2016 Festival and revised it for the 2017 Festival.

Wingerd traveled to Del Mar on September 12, 2017.  Immediately upon his arrival and

prior to performing any work-related tasks, Wingerd had a casual and brief meeting with Felts

and Byer to discuss what needed to be done throughout the week.  That evening, Felts told Byer:

> Starting tomorrow you need to be the voice of marketing (not BW)
> in our production mtgs and delegating all supporting work tasks to
> the team.  BW works for you this week/weekend as you and I
> discussed.  The only one reporting to the group on marketing can
> be you (and if BW wants to chime in he can of course).[53]

---

[49] Doc. 128-60.

[50] Doc. 128-8 at 163:1–10.

[51] Doc. 118-2 at 150:5–22.

[52] Doc. 128-5 at 177:15–178:12.

[53] Doc. 128-53.

Felts testified that he implemented the plan at the festival "in order to empower [Byer] to essentially run marketing, which I knew she would ultimately be continuing to do."[54]  He also testified that he believed Byer "need[ed] to take ownership for the work" she did.[55]  Felts instructed Byer to communicate the plan to Wingerd, which she found uncomfortable because it put her in "an awkward situation to have to tell someone who is my boss that I needed to take that role in what felt forced."[56]  Byer informed Wingerd of the instruction on the morning of September 13.  Taylor Gustafson, a marketing department employee, described Byer as "angry," "upset," "crying," and "uncomfortable" about the situation.[57]

After learning about his limited role, Wingerd felt crushed, defeated, and like he failed as a father and husband because he had "busted [his] hump to recover to be there," and believed that the decision made "no sense."[58]  Wingerd followed the company directives and did not say anything about his diminished role to other members of the marketing team.  At Byer's direction, Wingerd led morning marketing meetings and each evening told the team members what time to report the next morning.  After his role was limited at the festival, Wingerd told colleagues that he knew he was going to be fired.[59]

### D.    Termination

Gordon and Felts decided to terminate Wingerd's employment in a meeting in a private suite at the Del Mar fairgrounds on September 11, 2017, the day before Wingerd arrived at the festival.  Earnest participated and took handwritten notes at the meeting.  The notes reflect the

---

[54] Doc. 128-8 at 167:1–14.

[55] *Id*. at 169:3–7.

[56] Doc. 128-4 at 92:11–93:2.

[57] Doc. 128-5 at 78:15–80:9.

[58] Docs. 128-3 ¶ 58; 128-2 at 220:3–10.

[59] Doc. 128-5 at 172:2–6.

following performance issues: (1) Wingerd's increasingly infrequent communication; (2) conversion rates for selling passes "hit the skid" because of "extreme clutter on ticketing page"; (3) Wingerd's delay in implementing the website re-design; (4) the marketing department presentations were "getting worse [with] no real substance"; (5) a projected ticket shortfall at the 2017 festival; (6) Wingerd's general failure to govern the marketing department; (7) Wingerd's representations that he was working at 100%; and (8) the growing demands of the marketing department.[60]

Gordon believed there were a number of areas, including communication, collaboration, public relations, and timeliness, in which Wingerd needed to improve, but Wingerd was never told that he needed to improve in these areas. Felts believed Wingerd did not communicate with him enough. However, Wingerd provided Felts with updates concerning his work and communicated via email, and Felts never informed him that he needed to communicate more frequently. The other marketing department employees testified that Wingerd was responsive and a good supervisor throughout 2017.[61] Additionally, the company failed to meet the sales pass goal at both the 2016 and 2017 festivals. Although the marketing department was the "primary driver for ensuring the public knew about the festival,"[62] every department was responsible for the pass sales in some way.[63]

Gordon testified that he was dissatisfied with how Wingerd handled his job in securing a vendor to rebuild KAABOO's website because he believed the process should have been more robust. Gordon did not tell Wingerd to implement a more robust vendor proposal process.

---

[60] Doc. 118-15.

[61] *See, e.g.*, Docs. 128-4 at 60:23–61:6; 128-5 at 22:19–25; 128-6 at 119:7–20.

[62] Doc. 128-2

[63] Doc. 128-3 ¶ 31.

Gordon told Wingerd to identify, research, and recommend a website vendor, which he did, and executive leadership approved the website vendor.  The new website was built and launched on time and under budget.

Gordon also believed marketing "could be doing more on the street team."[64]  In early 2017, Gordon was "really anxious" to fill the open street team coordinator position and "hopping f-ing mad" that the position was not filled.[65]  However, the marketing department encountered difficulties filling a year-round position with a qualified candidate who would accept a $35,000 annual salary while residing in San Diego, California, a salary set by Gordon.  The person who was hired was not a "good fit" and was ultimately fired.[66]

Finally, KAABOO intended to implement an Influencer Program for the 2017 Del Mar Festival.  The program was Gordon's idea, and Parsons testified that "[i]t was communicated that Jason Felts would be leading [the influencer program]."[67]  The marketing department did little to launch the program, and it was ultimately discontinued.

Earnest and Felts terminated Wingerd on September 29, 2017, over the telephone.  Wingerd was in Lawrence, Kansas; Earnest and Felts were in Denver, Colorado.  Felts read a script Earnest prepared.[68]  On the call, Felts praised Wingerd, telling him "we greatly appreciate all of your hard work and dedication ever since you started working with KAABOO team back in 2015."[69]  Felts told Wingerd he was being terminated because (1) the company needed someone who "can travel nationally and internationally on a regular basis" and (2) "we need a

---

[64] Doc. 118-5 at 259:8–11.

[65] Docs. 118-17; 118-19.

[66] Doc. 118-6 at 34:4–19.

[67] Doc. 128-6 at 147:7–18.

[68] Doc. 128-61.

[69] Doc. 128-75.

leader with deep tactical marketing experience, as well as someone who is on site in Denver consistently."[70]

Following the phone call, Felts told Byer about Wingerd's termination.  Byer testified that when she asked why Wingerd was terminated, Felts told her "they wanted someone who would be in the Denver office who would be more on that tactical marketing side.  And [Felts] also told me that so that [Wingerd] could take care of his illness and spend time with family and friends."[71]  Felts testified that he does not recall telling Byer this.  Later that afternoon, following Wingerd's termination, Felts emailed Earnest, stating: "[n]ote that last week [Wingerd] reported to [Gordon] and I that our email database was up to almost 115,000.  In fact, it's actually 113,598.  Small discrepancy but one nevertheless."[72]

## IV.   Discussion

### A.   Disability Discrimination under the ADA

The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge."[73]  To establish a prima facie case of discrimination under the ADA, a plaintiff must show "(1) that he is disabled within the meaning of the ADA; (2) that he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that he was discriminated against because of his disability."[74]

---

[70] *Id.*

[71] Doc. 128-4 at 114:2–8.

[72] Doc. 128-76.

[73] 42 U.S.C. § 12112(a).

[74] *See McKenzie v. Dovala*, 242 F.3d 967, 969 (10th Cir. 2001) (quoting *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1269 (10th Cir. 1998) (internal quotation omitted)).

Here, it is undisputed that Wingerd has kidney and liver cancer.  Cancer constitutes a disability under the ADA.[75]  Further, it is undisputed that Wingerd was qualified and able to perform the essential functions of his job.  Accordingly, the Court considers whether Wingerd was intentionally discriminated against.  Wingerd argues that he was both discriminatorily discharged and demoted.  "A plaintiff may establish intentional discrimination either by [1] direct evidence or [2] by indirect proof under" the burden shifting framework in *McDonnell Douglas Corp v. Green*.[76]  "If the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate."[77]

### 1.    Direct Evidence

Wingerd asserts that he has presented direct evidence of disability discrimination. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption."[78]  "Direct evidence requires 'proof of an existing policy which itself constitutes discrimination,'"[79] or "oral or written statements on the part of a defendant showing a discriminatory motivation."[80]  "A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and,

---

[75] *See Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242, 1250 (D. Colo. 2012) ("[I]t should easily be concluded that . . . cancer substantially limits the major life activity of 'normal cell growth' and accordingly, constitutes a disability.") (quoting 29 C.F.R. § 1630.2(j)(3)(iii)), *aff'd*, 550 F. App'x. 596 (10th Cir. 2013).

[76] *Mitchell v. City of Wichita, Kan.*, 140 F. App'x 767, 776 (10th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803–04 (1973); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)).

[77] *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003).

[78] *Hall v. U.S. Dep't of Labor, Admin., Review Bd.*, 476 F.3d 847, 854 (10th Cir. 2007) (quoting *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999)).

[79] *Id.* at 854–55 (quoting *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996)).

[80] *Id.* at 855 (quoting *Kendrick*, 220 F.3d at 1225).

thus does not constitute direct evidence."[81]  And similarly, personal opinions, even those "reflecting personal bias or prejudice, do not constitute direct evidence of discrimination . . . because the trier of fact must infer discriminatory intent from such statements."[82]

Wingerd presents the following as direct evidence of discrimination: (1) on the same day of his termination, Felts told Byer that he fired Wingerd, in part, "so that [he] could take care of his illness and spend time with family and friends,"[83] and (2) during the termination call, Felts told Wingerd that he needed a leader that could travel "nationally and internationally on a regular basis."[84]  While Felts' statement regarding travel is not direct evidence—it requires an inference that Defendants improperly assumed Wingerd could not travel because of his illness—the Court finds that Felts' statement regarding Wingerd's illness is direct evidence.

Immediately after terminating Wingerd, Felts, a decision-maker, told Byer that the company had terminated Wingerd "so that [Wingerd] could take care of his illness and spend time with family and friends."[85]  This statement, if believed, proves that Wingerd was fired, at least in part, so that he could "take care of his cancer," a protected disability.  Felts' statement is evidence that "disability played a prominent part in the decision."[86]  Wingerd need not "prove that the discriminatory motive was the sole reason for his firing; rather, he must show only that it was a 'determining factor.'" [87]

---

[81] *Id.* (quoting *Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir. 2002)).

[82] *Id.* (citing *Shorter*, 188 F.3d at 1207).

[83] Doc. 128-4 at 114:2–8.

[84] Doc. 128-61.

[85] Doc. 128-4 at 114:2–8.

[86] *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003).

[87] *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011).

In *Twigg v. Hawker Beechcraft Corp.*, the Tenth Circuit discussed the narrowness of direct evidence: "Indeed, strictly speaking, the only direct evidence that a decision was made because of an impermissible factor would be an admission by the decisionmaker such as 'I fired him because he was too old.'"[88]  Here, the narrow definition of direct evidence is met.  The statement does not require an inference, nor is there a plausible benign way to interpret it: Felts, a decisionmaker, expressly stated that he fired Wingerd so that he could take care of his illness, a protected disability.

Defendants cite *Riggs v. AirTran Airways, Inc.*, in support of their contention that Felts statement is several steps removed from direct evidence.  In *Riggs*, the plaintiff alleged that she was terminated because of her age.[89]  The plaintiff's supervisor made comments such as "she was as old as her mother" and "she was too old to be moving heavy luggage."[90]  The court found this was not direct evidence because there was no "direct link between this treatment and the termination decision" and "the finder of fact would need to draw an inference in order to determine that the outward manifestations of [the defendant's] alleged age bias motivated her to terminate [the plaintiff]."[91]  Here, however, the discriminatory statement was directly connected to the termination decision; indeed, Felts told Byer it was *why* Wingerd was terminated.

Next, Defendants argue that Felts' statement does not constitute direct evidence because a jury would still need to find that Felts was not "softening his involvement in and the reasons for Wingerd's discharge in order to protect his relationship with Byer;" and further, that Wingerd spent the entirety of 2017 caring for his illness, which led to his "performance deficiencies that

---

[88] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n.8 (10th Cir. 2011) (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1185 (2d Cir.1992)) (internal quotation omitted).

[89] 497 F.3d 1108, 1112 (10th Cir. 2007).

[90] *Id*. at 1118.

[91] *Id*.

caused his termination."  These arguments, however, merely justify the statement and create a genuine issue of material fact for a jury.  The statement itself needs no inference to be discriminatory; indeed, the statement needs an inference to be interpreted in either of the non-discriminatory ways articulated by Defendants.  Felts denies making the statement, creating a genuine issue of material fact as to whether he made the statement and whether Wingerd was terminated because of his cancer.

### 2.  Circumstantial Evidence

Further, even if Felts' statement is not direct evidence, the Court finds that Wingerd's discrimination claim survives under the *McDonnell Douglas* burden shifting analysis.  When a plaintiff relies on circumstantial evidence to prove discrimination, courts apply the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*.[92]  The Tenth Circuit has described the framework as follows:

> *McDonnell Douglas* first requires the aggrieved employee to establish a prima facie case of prohibited employment action . . . .  If the employee makes a prima facie showing, the burden shifts to the defendant employer to state a legitimate, nondiscriminatory reason for its adverse employment action . . . .  If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual.[93]

### a.    Prima Facie Case

To establish a prima facie case of discrimination under the ADA, a plaintiff must show "(1) that he is disabled within the meaning of the ADA; (2) that he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3)

---

[92] *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973)); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015).

[93] *Plotke*, 405 F.3d at 1099.

that he was discriminated against because of his disability."[94]  As discussed above, the first two prongs are not disputed.  As for the third prong, there is a genuine issue of material fact as to whether Wingerd was discriminated against because of his disability.  On the same day of his termination, Felts told Byer that he fired Wingerd, in part, "so that [he] could take care of his illness and spend time with family and friends."[95]  Accordingly, the court finds there is a genuine issue of material fact as to whether Wingerd was discriminatorily discharged.

Additionally, there is a genuine issue of material fact as to whether Wingerd was demoted.  The Tenth Circuit liberally defines "adverse employment action" as any "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[96]  A reassignment may constitute a demotion when "the employee can show that he receives less pay, has less responsibility, or is required to utilize a lesser degree of skill than his previous assignment."[97]  When Wingerd returned to work from his medical leave around August 21, 2017, he was fully capable of performing all of his job responsibilities.  During that time, he oversaw the push to increase ticket sales.  However, on the day he arrived at the festival, Felts relieved Wingerd of his managerial duties and assigned those duties to Byer, telling her:

> Starting tomorrow you need to be the voice of marketing (not BW) in our production mtgs and delegating all supporting work tasks to the team.  BW works for you this week/weekend as you and I discussed.  The only one reporting to the group on marketing can be you (and if BW wants to chime in he can of course).[98]

---

[94] *See McKenzie v. Dovala*, 242 F.3d 967, 969 (10th Cir. 2001) (quoting *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1269 (10th Cir. 1998) (internal quotation omitted)).

[95] Doc. 128-4 at 114:2–8.

[96] *See Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003).

[97] *See Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.3d 793, 799 (10th Cir. 1993), *overruled in part on other grounds, Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir. 1995).

[98] Doc. 128-53.

A reasonable jury could find that the reassignment of Wingerd's management responsibilities constitute a "significant change in employment status."[99]  Accordingly, the Court finds that Wingerd has established a prima facie case of demotion.

### b.        Legitimate, Non-Discriminatory Reason

Under *McDonnell Douglas*, the burden shifts to Defendants to establish a legitimate, non-discriminatory reason for the termination.

Defendants offer the following reasons for Wingerd's termination: (1) in two consecutive years, he failed to meet the pass sales goals; (2) he did not perform his job responsibilities throughout 2017, despite his assurances and insistence that he would do so following his cancer diagnosis; (3) Wingerd procrastinated and missed deadlines, including in relation to the KAABOO website update, the Street Team, and the Influencer Program; and (4) Wingerd did not respond to messages from colleagues, rarely communicated with his supervisor and other company leadership, and did not adequately supervise the activities of the team.  The Court finds that Defendants have offered legitimate, non-discriminatory reasons for Wingerd's termination.

Defendants offer a separate legitimate reason for Wingerd's demotion: Wingerd was absent on medical leave for six weeks immediately prior to the festival, and Byer simply continued to manage the department.  Felts believed Byer "need[ed] to take ownership for the work" she did.[100]  Gordon felt that Wingerd "would have no grounding . . . what was planned."[101]  The Court finds Defendants have offered legitimate, non-discriminatory reasons for

---

[99] *See Stinnett*, 337 F.3d at 1217.

[100] Docs. 128-60; 128-8 at 169:3–7.

[101] Doc. 118-2 at 150:5–22.

Wingerd's alleged demotion.  Accordingly, to defeat summary judgment, Wingerd must present evidence that Defendants' reasons for his termination and demotion are pretextual.

**c.     Pretext**

When an employer advances multiple non-discriminatory reasons for a plaintiff's termination, the Tenth Circuit has adopted a general rule that "an employee must proffer evidence that shows each of the employer's justifications is pretextual."[102]  However, "when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility.  Under those circumstances, the jury need not believe the employer's remaining reasons."[103]

Pretext may be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[104]  A plaintiff typically makes a showing of pretext in three ways: (1) evidence that defendants' stated reason for the adverse employment action was false, *i.e.* unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff."[105]  The

---

[102] *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126 (10th Cir. 2005)).

[103] *Bryant*, 432 F.3d at 1126 (quoting *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000)).

[104] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

[105] *Fugett v. Sec. Transp. Servs., Inc.*, 147 F. Supp. 3d 1216, 1237 (D. Kan. 2015) (citing *Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

22

Court examines "the facts as they appear to the person making the decision to terminate plaintiff."[106]

Wingerd asserts that the direct evidence of discrimination discussed above is also evidence of pretext of his discriminatory discharge.  But Defendants' proffered reasons, which are also reflected in Earnest's notes from the termination meeting, are inconsistent with the reasons Felts, the decision-maker, gave to both Wingerd and Byer for the termination decision. Felts told Wingerd that Defendants needed someone who "can travel nationally and internationally on a regular basis" and that Defendants "[needed] a leader with deep tactical marketing experience, as well as someone who is on site in Denver consistently."[107] And, when Byer asked why Wingerd had been terminated, Felts told her "they wanted someone who would be in the Denver office who would be more on that tactical marketing side.  And . . . so that [Wingerd] could take care of his illness and spend time with family and friends."[108]

Further, Felts told Wingerd that he was terminated in part because the company needed someone who could travel nationally and internationally.[109]  However, Wingerd asked about travelling internationally and was eager to do so, but Defendants never sent Wingerd on international travel.  Wingerd never told Defendants that his illness prevented regular travel, and they did not ask him about his ability or willingness to travel following his surgery.  Wingerd was able to travel except to the extent travel occasionally conflicted with cancer treatments Indeed, he traveled to California and worked over 120 hours during the 2017 festival, despite having major surgery about ten weeks prior.  Wingerd testified that he "would have traveled

---

[106] *Fisher v. Sw. Bell Tel. Co.*, 361 F. App'x 974, 979 (10th Cir. 2010) (quoting *Kendrick*, 220 F.3d at 1231).

[107] Doc. 128-75.

[108] Doc. 128-4 at 114:2–8.

[109] Doc. 128-61.

much more during 2017 if Bryan Gordon had not told me that travel [for meetings] was unnecessary."[110]  Moreover, Felts told Wingerd and Byer that they wanted someone who was consistently on-site in Denver.  But, Gordon told Wingerd he should participate in company meetings via telephone.[111]  Felts was not privy to this conversation, but viewed the telephone participation as an accommodation.[112]  At summary judgment, the Court finds that Felts' inconsistent reasons for the termination demonstrate pretext as to all of Defendants' proffered reasons.

Furthermore, Wingerd has offered evidence that Defendants' proffered reasons based on Wingerd's performance are pretextual.  Although the company failed to meet the sales pass goal at both the 2016 and 2017 festivals, it is controverted the extent to which the marketing department was responsible for meeting those goals.  Further, although Felts testified that Wingerd did not communicate with him enough, Wingerd provided Felts with regular updates concerning his work and communicated via email and Felts never informed Wingerd that he needed to communicate more frequently.  Indeed, Gordon instructed Wingerd "to not overdo it, to ask for help, to ensure that health came first,"[113] and to relax, focus on his health, and "let go of the reins."[114]  Felts also told Wingerd to make family a priority and encouraged him to "dip out, go off grid" if needed.[115]  Moreover, the other marketing department employees testified that Wingerd was responsive and a good supervisor throughout 2017.[116]

---

[110] Doc. 128-3 ¶ 6.

[111] Doc. 128-1 at 85:5–13 ("[O]ne immediate accommodation was . . . that [Wingerd] wouldn't be able to travel.").

[112] Doc. 128-8 at 177:6–17.

[113] Doc. 128-2 at 234:16–235:4.

[114] Doc. 128-3 ¶ 49

[115] Doc. 128-8 at 101:1–102:25.

[116] *See, e.g.*, Docs. 128-4 at 60:23–61:6; 128-5 at 22:19–25; 128-6 at 119:7–20.

Gordon offered other performance-based reasons for termination.  He testified that he was dissatisfied with how Wingerd handled his job in securing a vendor to rebuild KAABOO's website because he believed the process should have been more robust, but Gordon did not tell Wingerd to implement a more robust vendor proposal process.  Executive leadership approved the website vendor, and the new website launched on time and under budget.  Further, while Gordon also believed marketing "could be doing more on the street team,"[117] the marketing department encountered difficulties filling a year-round position with a qualified candidate who would accept a $35,000 annual salary while residing in San Diego, California, a budget set by Gordon.  Finally, it is controverted who was responsible for implementing the Influencer Program for the 2017 Del Mar Festival.  Defendants assert that Wingerd was responsible for developing the program, but Parsons testified that "[i]t was communicated that Jason Felts would be leading [the influencer program]."[118]

Lastly, Wingerd points to evidence that Defendants were *ex post facto* looking for justifications for his termination.  After terminating Wingerd, Felts sent an email to Earnest stating, "[n]ote that last week [Wingerd] reported to [Gordon] and I that our email database was up to almost 115,000.  In fact, it's actually 113,598.  Small discrepancy but one nevertheless."[119] A reasonable jury could find Defendants' proffered reasons for Wingerd's termination to be pretextual.

With regard to his demotion, the Court finds Wingerd also has presented sufficient evidence of pretext.  Although Gordon testified he instructed Felts to limit Wingerd's role

---

[117] Doc. 118-5 at 259:8–11.

[118] Doc. 128-6 at 147:7–18.

[119] Doc 128-76.

because Wingerd "would have no grounding . . . [in] what was planned,"[120] the Marketing Department simply revised Wingerd's 2016 task plan for the 2017 Festival.  Wingerd returned to work on August 21, 2017, a number of weeks before the festival, and oversaw the final push to increase ticket sales.  Moreover, Defendants did not inform Wingerd that his role would be limited at the festival at this time or at any point prior to his arrival.  Although Felts had a "specific plan" for Wingerd's role at the festival prior to Wingerd's arrival,[121] he did not strip Wingerd of his management responsibilities until after seeing his gaunt and pale appearance.  After meeting briefly with Wingerd, Felts told Byer "[s]tarting tomorrow you need to be the voice of marketing (not [Wingerd])."[122]  Additionally, viewing the facts in the light most favorable to Wingerd, Defendants precluded Wingerd from being grounded in the plans: in June 2017, Felts began working directly with Byer on Marketing Department decisions, but when Byer asked to bring Wingerd in the loop, Felts told her not to.[123]  Drawing all inferences in Wingerd's favor, a reasonable jury could find that Felts demoted Wingerd because of his cancer.  Accordingly, the Court denies summary judgment on Wingerd's discrimination claim.

### B.      Retaliation under the ADA

Under 42 U.S.C. § 12203(b), "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed . . . any right granted or protected by [the ADA]."  As discussed above,

---

[120] Doc. 118-2 at 150:5–22.

[121] Doc. 128-60.

[122] Doc. 128-53.

[123] Doc. 128-4 at 73:12–75:5.

when the plaintiff relies on circumstantial evidence to prove discrimination, the Court applies the *McDonnell Douglas* burden shifting analysis.[124]

### 1. Prima Facie Case

A prima facie case of retaliation under the ADA requires: "(1) that [an employee] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[125]  Defendants assert that Wingerd's retaliation claim must fail because Wingerd did not request any accommodation, and thus there is no protected activity.  Wingerd argues that he did request an accommodation, and that "acceptance of an accommodation is a protected activity."[126]

In his deposition, Wingerd stated that he did not want to be treated like a "cancer patient," that he wanted to be treated like "everybody else," and testified that "he did not ask for any accommodations."[127]  Wingerd was, however, permitted to participate in company meetings via telephone, which both Gordon and Felts viewed as an accommodation.  Further, Wingerd created a bandwidth plan and delegated his work to other marketing department employees, including Byer.  He took time off to undergo chemotherapy, when he was in the emergency room with pneumonia, and for travel and treatment at MD Anderson.  Finally, he took a six-week medical leave for cancer surgery.

Defendants assert that taking medical leave pursuant to a company policy, without more, is not a request for a reasonable accommodation.  Wingerd argues that this assertion is contrary

---

[124] *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973)); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015).

[125] *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012).

[126] *Praseuth v. Newell-Rubbermaid, Inc.*, 219 F. Supp. 2d 1157, 1192 (D. Kan. 2002).

[127] Docs. 118-5 at 233:10–13; 128-2 at 198:8–22.

to Tenth Circuit authority.  "An allowance of time for medical care or treatment may constitute a reasonable accommodation.  However, an indefinite unpaid leave is not a reasonable accommodation where the plaintiff fails to present evidence of the expected duration of her impairment."[128]  Wingerd's leave was not for an indefinite period, but rather for six weeks and approved by Defendants.

Defendants cite *Mesta v. Town of Evansville* for the proposition that a plaintiff must classify his medical leave as a reasonable accommodation under the ADA in order for the leave to be a protected activity.[129]  In *Mesta*, the court found that the plaintiff had not presented evidence that his leave was an accommodation provided by the company under the ADA.[130]  In contrast, here, Wingerd specifically communicated with Earnest about taking a limited duration of disability leave under Defendants' disability leave policy.  Further, the Tenth Circuit has explicitly ruled that an individual "need not mention the ADA or use the phrase 'reasonable accommodation.'"[131]  Accordingly, viewing all facts in the light most favorable to Wingerd, Wingerd's medical leave and Defendants allowing him to participate in company meetings via telephone and delegate his work to other marketing department employees constitute accommodations, and his acceptance of these accommodations is a protected activity.

Next, Wingerd must show that a reasonable employee would find the challenged action materially adverse.  Here, the first challenged action is Wingerd's termination, which a

---

[128] *Rascon v. US W. Commc'ns, Inc.*, 143 F.3d 1324, 1333–34 (10th Cir. 1998), *overruled on other grounds by New Hampshire v. Maine*, 532 U.S. 742 (2001) (citing *Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996)); *see also Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002) ("We have previously explained that limited leave for medical treatment may qualify as reasonable accommodation under the ADA.").

[129] No.17-CV-17-NDF, 2017 WL 6551293 (D. Wyo. Nov. 21, 2017).

[130] *Id*. at *7.

[131] *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) (en banc).

reasonable person would find to be materially adverse.[132]  The second is Wingerd's demotion.  A reasonable jury could find a demotion from a managerial position to be materially adverse.[133]  Thus, the Court must decide whether a causal connection existed between the protected activity and the materially adverse action.[134]

A causal connection exists between the protected activity and the materially adverse action "where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive."[135]  "In order to make a *prima facie* case, one must only introduce evidence from which an inference can be drawn that an employer would not have taken the adverse action had the employee not [engaged in the protected activity]."[136]  Courts typically consider "protected conduct *closely followed by* adverse action" as sufficient evidence.[137]  However, "[u]nless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."[138]  Although temporal proximity does not require a specific amount of time, the Tenth Circuit has found that "a period of six weeks gives rise to a rebuttable inference of a causal connection."[139]

Wingerd began planning his travel to Del Mar while he was on medical leave.  Byer communicated Wingerd's plans to Gordon, Felts, and Earnest no later than August 17, 2017.[140]  Immediately after learning that Wingerd intended to participate in the festival, Gordon expressed

---

[132] *See, e.g.*, *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

[133] *See Sekerak v. City & Cty. of Denver*, 1 F. Supp. 2d 1191, 1195–96 (D. Colo. 1998).

[134] *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012).

[135] *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[136] *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[137] *Id.* (emphasis added).

[138] *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

[139] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

[140] Doc. 126-8.

concern and set up a meeting to discuss Wingerd.[141]  On September 11, Gordon and Felts decided to terminate Wingerd's employment.  And on September 12, Felts gave Byer managerial responsibility for the marketing department.  Accordingly, there is close temporal proximity between Wingerd's medical leave and both his demotion and Defendants' termination decision.

Additionally, Wingerd has offered other evidence of causation.  Wingerd was permitted to call into company meetings rather than travel to Colorado, which both Felts and Gordon acknowledged was an accommodation.  Felts told Wingerd, however, that he was terminated in part because the company needed someone who could travel nationally and internationally.[142]  Finally, although Felts had a "specific plan" regarding Wingerd's role at the festival prior to his arrival,[143] he did not strip Wingerd of his management responsibilities until after he saw Wingerd's gaunt and pale appearance.  Thus, the Court finds that Wingerd has established a prima facie case of retaliation.

### 2.  Legitimate, Non-Discriminatory Reasons

As discussed above, under the *McDonnell Douglas*, the burden now shifts to Defendants to establish a legitimate, non-discriminatory reason for the termination.  Defendants offer the same reasons for Wingerd's termination and demotion as asserted above, and the Court again finds that Defendants have offered legitimate, non-discriminatory reasons for Wingerd's termination.

### 3.  Pretext

Finally, the burden shifts back to Wingerd to offer evidence of pretext.  As discussed above, pretext may be shown by demonstrating "such weaknesses, implausibilities,

---

[141] Doc. 128-58.

[142] Doc. 128-61.

[143] Doc. 128-60.

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[144] Additionally, in the retaliation context, "[t]o raise a fact issue of pretext, plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive."[145]  For many of the same reasons articulated above, the Court finds that Wingerd has established pretext.

Immediately after learning that Wingerd planned to return from medical leave—a protected accommodation—and participate in the festival, Gordon set up the meeting at which Gordon, Felts, and Earnest decided to terminate Wingerd; this is the first time that Wingerd's termination was discussed.  As discussed above, Defendants' proffered reasons are inconsistent with the reasons Felts, the decision-maker, gave to both Wingerd and Byer.  Felts told Byer "they wanted someone who would be in the Denver office who would be more on that tactical marketing side.  And . . . so that [Wingerd] could take care of his illness and spend time with family and friends."[146]  A reasonable jury could find that Wingerd was retaliated against for "tak[ing] care of his illness" by taking medical leave.

Further, Wingerd's participation in company meetings via phone was an accommodation.  Wingerd could travel except to the extent travel occasionally conflicted with cancer treatments, and he never told Defendants that his illness prevented regular travel.  Defendants did not ask Wingerd about his ability or willingness to travel following his surgery.   Yet, Felts told Wingerd that he was terminated, in part, because they needed someone who "can travel nationally and internationally on a regular basis."[147]  A reasonable jury could find Defendants retaliated against

---

[144] *Argo*, 452 F.3d at 1203.

[145] *Fugett v. Sec. Transp. Servs., Inc.*, 147 F. Supp. 3d 1216, 1237 (D. Kan. 2015).

[146] Doc. 128-4 at 114:2–8.

[147] Doc. 128-61.

Wingerd for accepting the accommodation to limit his travel and participate in meetings via phone.

Finally, Defendants allowed Wingerd to delegate his work to other marketing department employees and instructed him "to not overdo it, to ask for help, to ensure that health came first," and "let go of the reins." Wingerd took time off and delegated work pursuant to this accommodation. To the extent Defendants justify Wingerd's termination based on his delegation of work and decreased responsiveness, the Court finds that a reasonable jury could find Defendants' reasons to be pretextual. Accordingly, there is a genuine issue of material fact as to whether Wingerd was terminated for accepting Defendants' accommodations.

The Court finds that Wingerd has also demonstrated pretext for his retaliatory demotion claim. Immediately after returning from medical leave, Felts limited Wingerd's managerial responsibilities. When Byer tried to keep Wingerd in the loop immediately prior to his medical leave, Felts told her not to. Although Gordon testified he instructed Felts to limit Wingerd's role because Wingerd "would have no grounding . . . [in] what was planned,"[148] the Marketing Department revised Wingerd's 2016 plan for the 2017 Festival. Further, Wingerd returned to work on August 21, 2017, several weeks before the festival, and oversaw the final push to increase ticket sales. A reasonable jury could find that Wingerd was demoted for his acceptance of protected accommodations. Accordingly, summary judgment is denied as to Wingerd's retaliation claim.

### C.    Fair Labor Standards Act

Wingerd seeks overtime pay under the FLSA. The general rule under the FLSA is that any employee who works more than forty hours in a work-week must receive overtime

---

[148] Doc. 118-2 at 150:5–22.

compensation.[149]  Employers need not pay overtime, however, if the employee is "employed in a bona fide executive, administrative, or professional capacity" as defined by the regulations promulgated by the Secretary of Labor.[150]  While it is the employee's burden to prove that the employer is violating the FLSA,[151] it is the defendant employer's burden to prove that the employee falls within one of these exceptions, all of which are narrowly construed against it.[152]

Under the Department of Labor regulations, an employee qualifies for the executive exemption if the employee: (1) is paid a salary not less than $455 per week; (2) has a primary duty of management; (3) regularly directs two or more employees; and (4) has "authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight."[153]  However, "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."[154]  This exemption applies to employees whose annual salary exceeds a certain threshold, set at $134,004 for employment after December 1, 2016.[155]  It is uncontested that Wingerd was an exempt employee prior to the 2017 festival.  Thus, the only question is whether Wingerd was demoted to a non-exempt position.  Defendants assert that Wingerd remained an executive employee throughout his employment.  Wingerd alleges that he was demoted when he arrived at the festival.

---

[149] *See* 29 U.S.C. § 207(a)(1).

[150] *See* 29 U.S.C. § 213(a)(1).

[151] *Christensen v. Harris Cty.*, 529 U.S. 576, 585 (2000).

[152] *Chessin v. Keystone Resort Mgmt., Inc.*, 184 F.3d 1188, 1192 (10th Cir. 1999).

[153] 29 C.F.R. § 541.100(a)(1)–(4) (2005).

[154] 29 C.F.R. § 541.601(c).

[155] 29 C.F.R. § 541.601(b).

Wingerd's classification is based on his primary duties, which are determined holistically based on his two-year employment with Defendants.[156]  Temporary performance of non-exempt work does not destroy Wingerd's classification as an exempt employee.[157]  "The term 'primary duty' means the principal, main, major or most important duty that the employee performs . . . with the major emphasis on the character of the employee's job as a whole."[158]  Here, the alleged demotion lasted from approximately September 12 to September 29.  Wingerd's alleged demotion was temporary, and his salary, a strong indicator of his exempt status, and job title did not change.  He was properly classified as an exempt employee for the duration of his employment with Defendants.  Accordingly, summary judgment is granted on Wingerd's FLSA claim.

**D.      State Law Claims**

Wingerd asserts six claims under California law: (1) Count V: Discrimination in Violation of the FEHA—Demotion; (2) Count VI: Discrimination in Violation of the FEHA—Termination; (3) Count VII: Retaliation in Violation of the FEHA—Demotion; (4) Count VIII: Retaliation in Violation of the FEHA—Termination; (5) Count IX: Wrongful Demotion in Violation of California Public Policy; and (6) Count X: Wrongful Termination in Violation of California Public Policy.  Defendants assert that Kansas law applies to these claims based on a choice of law analysis, and therefore, Wingerd's claims based on California law should be dismissed.  Wingerd responds that his statutory claims do not present a choice of law issue and further, even if they do, California law applies to both his statutory and common law claims.

---

[156] *See Counts v. S.C. Elec. & Gas Co.*, 317 F.3d 453, 457 (4th Cir. 2003).

[157] *Id.*

[158] 29 C.F.R. § 541.700(a).

### 1. Statutory Claims Outside of Choice of Law Analysis

As an initial matter, Wingerd asserts that "if a party sues under a specific statute, there is no true choice-of-law issue."[159]  He points to a trend in securities litigation cases, beginning with *Lintz v. Carey Manor Ltd.*, where courts have found that one action can violate several Blue Sky laws simultaneously, and there is "no conflict of law question presented by these overlapping statutes."[160]  Wingerd argues that "while many of these decisions involve securities litigation, the courts' rationale is equally applicable to an act like the FEHA."[161]  The Court disagrees.

"Securities transactions are *unique* and a traditional conflict of laws analysis is not a good fit."[162]  The *Lintz* court opined that a choice of law analysis is improper when a "state has a comprehensive scheme for the regulation of securities," which regulates securities activities within their borders but also extraterritorial securities activities by their citizens.[163]  This reasoning does not extend to employment discrimination claims.  Wingerd has presented no evidence of a "comprehensive scheme" or any other compelling justification for why a traditional choice of law analysis is unsuitable for employment discrimination actions.  Wingerd asserts that "today's society" justifies the expansion because employers and employees may live in different states and provide services for activities occurring in other states.[164]  The Court is unpersuaded.  Indeed, the purpose of choice of law jurisprudence is to account for situations

---

[159] *Progressive Emu, Inc. v. Nutrition & Fitness, Inc.*, No. 2:12-CV-02805-WMA, 2012 WL 5426237, at *1 (N.D. Ala. Nov. 5, 2012).

[160] 613 F. Supp. 543, 551 (W.D. Va. 1985).

[161] Doc. 128 at 92.

[162] *United Heritage Life Ins. Co. v. First Matrix Inv. Servs. Corp.*, No. CV 06-0496-S-MHW, 2009 WL 3229374, at *4 (D. Idaho Sept. 30, 2009) (emphasis added).

[163] *Lintz*, 613 F. Supp. at 550 (citing *The Conflict of Laws Provisions of the Uniform Securities Acts*, 31 Okla. L. Rev. 781 (1978)).

[164] Doc. 128 at 92.

exactly like the present case.  Other courts have similarly refused to expand *Lintz* outside the securities law context.  "Whatever the merits of the holding in *Lintz,* it is clearly restricted to the context of securities laws.  To hold otherwise would be to revolutionize choice of law jurisprudence."[165]

Both non-securities cases cited by Wingerd are distinguishable.  In *Progressive Emu, Inc. v. Nutrition & Fitness, Inc.*, a counter-claim plaintiff alleged unfair and deceptive trade practices under a North Carolina statute.[166]  The United States District Court for the District of Alabama held that Alabama law could not apply to a North Carolina statutory claim.[167]  The court reasoned that the North Carolina claim was transferred for purposes of consolidation and the law of the transferor court applied, and further, Alabama choice of law rules would apply North Carolina rules based on the place of injury.[168]  Here, Defendants are not asking that Kansas law apply to a California statutory claim, and this case has not been transferred.  In *San Francisco Residence Club, Inc. v. Park Tower, LLC*, the court held that "plaintiffs simply cannot bring claims under specific Alabama statutes, and then attempt to argue that California law applies in the enforcement and interpretation of these Alabama statutes."[169]  Wingerd, however, has not argued that Kansas law applies to his California claims.  Accordingly, the Court will conduct a choice of law analysis.

---

[165] *Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*, No. CIV.A.3:05CV355, 2006 WL 5908727, at *11 (E.D. Va. Feb. 10, 2006).

[166] No. 2:12-CV-02805-WMA, 2012 WL 5426237, at *2 (N.D. Ala. Nov. 5, 2012).

[167] *Id.*

[168] *Id.*

[169] No. 5:08-CV-1423-AKK, 2012 WL 8169890, at *4 (N.D. Ala. Jan. 12, 2012).

### 2.      Choice of Law Analysis

A federal court exercising "supplemental jurisdiction over state law claims in a federal question lawsuit" must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules.[170]  Consequently, Kansas choice of law rules apply.  First, the Court first must determine whether a true conflict exists.[171]  Where the outcome of a dispute would be the same under the laws of either state, the Court need not decide the conflict and may apply Kansas law.[172]

Here, both parties agree that there is a material difference between California and Kansas statutory employment discrimination claims, as well as between California and Kansas common law claims of wrongful demotion and termination.  The Court finds that there is a true conflict in this case.  Wingerd has not pled Kansas statutory claims, and should Kansas law apply, Wingerd's California statutory claims are subject to dismissal.[173]  Accordingly, the Court will conduct a choice of law analysis.

Kansas applies the Restatement (First) of Conflict of Laws in addressing choice of law issues.[174]  Wingerd, as the party moving the Court to apply the law of California, bears the

---

[170] *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999).

[171] *Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 372 (Kan. 2002) ("Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a 'false conflict' and the court need not decide the choice of law issue.").

[172] *Shutts v. Phillips Petroleum Co.*, 732 P.2d 1286, 1291 (Kan. 1987) ("[I]f the law of Kansas is not in conflict with any of the other jurisdictions connected to the suit, then there is no injury in applying the law of Kansas."); *Howard v. Ferrellgas Partners, L.P.*, 92 F. Supp. 3d 1115, 1123 (D. Kan. 2015) (applying Kansas law where the parties agreed and it had been established that the court's findings would be the same whether it followed Kansas, Washington, or California law).

[173] *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1234 (D. Kan. 2015) (dismissing claims under Minnesota consumer protection statutes based on choice of law analysis); *Martin v. D-Wave Sys. Inc.*, No. C-09-03602 RMW, 2009 WL 4572743, at *6 (N.D. Cal. Dec. 1, 2009) (dismissing FEHA claims after conducting choice of law analysis).

[174] *See, e.g.*, *In re K.M.H.*, 169 P.3d 1025, 1031–32 (Kan. 2007).

burden to present sufficient facts to show that California law should apply.[175]  Where "a party

fails to make 'a clear showing that another state's law should apply,' Kansas choice of law

principles require a court to default to Kansas substantive law.

"The first step in determining whose law is to govern a conflict situation is the

characterization of what kind of case is involved."[176]  Kansas courts conduct their choice-of-law

analysis on an issue-by-issue, rather than case-by-case, basis.[177]  Whereas Defendants assert that

discrimination claims most closely resemble tort actions, Wingerd states that wrongful demotion

and termination claims involve principles of both tort and contract law because "the employment

relationship includes express or implied contractual duties."[178]  Wingerd asserts that "[c]ourts

across the country have split as to whether such wrongful discharge or demotion claims should

be analyzed as torts or contract for choice-of-law purposes" and points the Court to two

employment dispute cases in which the court conducted a choice of law analysis based on

contract principles.[179]  The Court finds both cases distinguishable.  In both cases, a contract was

central to the dispute, specifically, the validity of an arbitration agreement[180] or the existence of

an implied employment contract.[181]  Neither involved discriminatory termination or demotion

claims.  Moreover, courts across the country have found that employment discrimination claims

---

[175] *Id.* at 1032.

[176] *Miller v. Dorr*, 262 F. Supp. 2d 1233, 1238 (D. Kan. 2003).

[177] *See Brown v. Kleen Kut Mfg. Co.*, 238 Kan. 642, 645–46 (Kan. 1986).

[178] Doc. 128 at 96.

[179] *Id.* at 97.

[180] *Flemma v. Halliburton Energy Servs., Inc.*, 303 P.3d 814, 820 (N.M. 2013) (discussing the validity of arbitration clause).

[181] *Dobbs v. Chevron U.S.A., Inc.*, 39 F.3d 1064, 1068 (10th Cir. 1994) (finding that claim arose from contract when the central question was whether the plaintiffs were "parties to implied contracts for careers.") (internal quotation removed).

sound in tort, not contract.[182]  While Kansas has not explicitly conducted a choice of law analysis for a wrongful termination claim, Kansas courts have held that employment retaliation claims sound in tort.[183]  "The question to be determined here is whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged expressed agreement between the parties."[184]

Here, Wingerd's claims are unrelated to the existence or terms of his employment contract, or any agreement between the parties; indeed, it is uncontroverted that his employment was at-will and could be terminated at any time, with or without cause.  The wrongful termination and demotion claims "arise[] from a duty imposed by law based upon public policy."[185]  Wingerd's claims are based on disability discrimination in violation of public policy. Accordingly, his discrimination, demotion, and retaliation claims sound in tort.

For tort claims, Kansas follows the lex loci delicti approach, meaning the law of the "place of the wrong" controls.[186]  "The 'place of the wrong' is that place where the last event necessary to impose liability took place."[187]  Because Wingerd's claims based on wrongful

---

[182] *See, e.g.*, *Kennicott v. Sandia Corp.*, 314 F. Supp. 3d 1142, 1171 (D.N.M. 2018) ("Although no New Mexico court has determined whether an employment discrimination claim arises where the allegedly discriminatory employment decision is made, the Court sees no sound reason to treat the NMHRA and the NMFPWA differently than any other *tort* under New Mexico law."); *Krause v. UPS Supply Chain Sols., Inc.*, No. CIV.A.08-CV-10237DPW, 2009 WL 3578601, at *5 (D. Mass. Oct. 28, 2009) ("The Plaintiff's state law discrimination and retaliation claims under Chapter 151B and the MMLA . . . are akin to tort . . . .The Plaintiff's commissions-related claims for violation of the Wage Act and breach of contract . . . are contractual in nature."); *Robins v. Max Mara, U.S.A., Inc.*, 923 F. Supp. 460, 465 (S.D.N.Y. 1996) ("While it is clear that an employment discrimination claim is not a tort, the claim is still a case of conduct regulation.').

[183] *Murphy v. City of Topeka-Shawnee Cty. Dep't of Labor Servs.*, 630 P.2d 186, 190 (Kan. 1981).

[184] *Id.*

[185] *See id.* (holding that a retaliatory discharge claim sounds in tort, not contract: "Plaintiff's action clearly sounds in tort, and the mere existence of a contractual relationship between the parties does not change the nature of his action."); *Platt v. Kan. State Univ.*, 379 P.3d 362, 366 (Kan. 2016) (finding that a retaliatory discharge claim was an "actionable tort").

[186] *See Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985).

[187] *Aiken v. Emp'r Health Servs., Inc.*, 81 F.3d 172, 1996 WL 134933, at *2 (10th Cir. Mar. 23, 1996) (unpublished table decision) (citing *Ling*, 703 P.2d at 735).

termination have a distinct factual basis—and therefore place of injury—from his claims based on wrongful demotion, the Court considers Wingerd's wrongful termination statutory and common law claims (Counts VI, VIII, and X) together, followed by Wingerd's wrongful demotion claims (Counts V, VII, and IX).

### i.    Wrongful Termination: Counts VI, VIII, and X

Wingerd alleges discrimination, retaliation, and wrongful termination under the FEHA and California common law.  Defendants contend that because the phone call terminating Wingerd's employment occurred while Wingerd was in Kansas, Kansas is the place of the harm. Wingerd argues that he was "aware of the termination decision while he was still working in California," and accordingly, he suffered the injury in California.[188]

Wingerd cites *Aiken v. Employer Health Services, Inc.*, to support his argument that California is the place of his injury.  In *Aiken*, the Tenth Circuit found that the place of wrong was where the plaintiff received "notice that he was being terminated."[189]  While Wingerd may have believed he would be terminated while he was in California, Wingerd has alleged no evidence that he had actual notice of his termination in California.  Defendants' decision to terminate Wingerd is not the "last event necessary to impose liability."[190]  Rather, the actual termination of his employment is the last act necessary to impose liability.  There is no factual dispute as to where Wingerd's termination occurred: Wingerd received notice of his termination while he was in Kansas. Accordingly, Kansas is the place of injury.  Further, Wingerd's contention that the Court should look outside the traditional lex loci delicti approach because

---

[188] Doc. 128 at 97.

[189] *Aiken*, 1996 WL 134933 at *3.

[190] *Id.* at *2.

Kansas "has little connection with the underlying cause of action" is without merit.[191]  Wingerd is a Kansas resident who conducted business from his primary office in Kansas and who was physically in Kansas when he was terminated.  As such, the Court applies Kansas law to Wingerd's statutory and common law wrongful termination claims.

Wingerd has alleged statutory claims for wrongful termination under the FEHA, and has not pled any claims under the Kansas Act Against Discrimination, K.S.A. 44-1001.  Accordingly, Wingerd's statutory wrongful termination claims, which allege violations of California law, fail to state claims for relief under Kansas law.[192]  The Court grants summary judgment on Wingerd's FEHA wrongful termination claims.

Wingerd's California common law termination claim fails for the same reason: Kansas law applies to Wingerd's common law wrongful termination claim.  Wingerd has not pled a wrongful termination claim under Kansas common law, which is limited to narrow circumstances, such as whistle-blowing.[193]  Accordingly, the Court grants summary judgment on Wingerd's common law wrongful termination claim.

### ii.    Wrongful Demotion and Retaliation: Counts V, VII, and IX

Wingerd's statutory discriminatory and retaliatory demotion claims, as well as his common law demotion claim, present a separate choice of law issue.  Unlike his wrongful termination claims, the actions underlying Wingerd's demotion claim all happened in California.

---

[191] *Id.*

[192] *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1232 (D. Kan. 2015) (dismissing claims under Minnesota consumer protection statutes after conducting a choice of law analysis because "Minnesota law would not be chosen as the applicable law governing claims by the non-residents"); *Hamby v. Ohio Nat. Life Assur. Corp.*, No. CIV. 12-00122 JMS, 2012 WL 2568149, at *4 (D. Haw. June 29, 2012) (dismissing Washington statutory claims after finding that Hawaii law applies in a choice of law analysis.)

[193] *See, e.g.*, *Scott v. Topeka Performing Arts Ctr., Inc.*, 69 F. Supp. 2d 1325, 1327 (D. Kan. 1999); *Chapman v. Atchison Casting Corp.*, No. CIV.A. 99-2094-KHV, 2000 WL 1469315, at *2 (D. Kan. Sept. 25, 2000).

Felts sent an email discussing his "specific plan" while he was in California, Felts gave Byer managerial responsibilities while they were both in California, and Byer communicated Felts' decision to Wingerd on September 12 at the Del Mar fairgrounds.  As discussed above, Kansas choice of law dictates that the "place of the wrong" is "where the last event necessary to impose liability took place."[194]  Wingerd's alleged demotion at the festival is the last event necessary with regard to his demotion claims.  Accordingly, California law applies to Wingerd's demotion claims.

Because Wingerd, a non-California resident, has alleged California statutory claims, the Court must consider whether the FEHA may apply extraterritorially.  There is a presumption that state statutes do not apply extraterritorially.[195]  The California Court of Appeals has held that the FEHA "was not intended to apply to non-residents where . . . the tortious conduct took place out of this state's territorial boundaries."[196]  The relevant inquiry is whether the conduct underlying the claim took place in California.[197]  Here, the alleged tortious conduct underlying Wingerd's demotion claims occurred primarily at the Del Mar Festival in California.  Defendants organize a multi-day music festival in California, and employment disputes arising out of actions that occur at that festival are properly brought under California law.  Accordingly, the Court finds that the FEHA may apply extraterritorially to Wingerd's demotion claims.  Wingerd may bring claims for discriminatory and retaliatory demotion under the FEHA, and the Court will apply California law to Wingerd's FEHA and common law demotion claims.

---

[194] *Aiken v. Emp'r Health Servs., Inc.*, 81 F.3d 172, 1996 WL 134933, at *2 (10th Cir. Mar. 23, 1996) (unpublished table decision) (citing *Ling*, 703 P.2d at 735).

[195] *Sims v. Worldpac Inc.*, No. C 12-05275 JSW, 2013 WL 663277, at *2 (N.D. Cal. Feb. 22, 2013).

[196] *Campbell v. Arco Marine, Inc.,* 50 Cal. Rptr. 2d 626 (Cal. Ct. App. 1996) (alteration in original).

[197] *See Roger-Vasselin v. Marriott Int'l, Inc.*, No. C04-4027 TEH, 2006 WL 2038291, at *8 (N.D. Cal. July 19, 2006).

Finally, the Court must consider whether Defendants are entitled to summary judgment on the merits of Wingerd's FEHA and common law demotion claims.  Like the Tenth Circuit, California courts consider whether an action constitutes an adverse employment decision on a "case-by-case basis."[198]  The adverse employment action must be "significant" and more than "a mere inconvenience or alteration of job responsibilities."[199]  And finally, California applies the *McDonnell Douglas* burden shifting analysis to both the FEHA and common law employment discrimination actions.[200]

As discussed above, the Court finds that Wingerd's discriminatory and retaliatory demotion claims survive under *McDonnell Douglas*.  Accordingly, the court denies summary judgment on Wingerd's state law statutory and common law claims based on his demotion.

### E.        KAABOO and Madison Employment

The plaintiff in a federal employment discrimination case carries the burden of establishing that the defendant was his employer.[201]  Madison argues that is it is not liable because it was not Wingerd's employer.  The Tenth Circuit employs two tests to determine whether a defendant is an employer: the joint employer test and the single employer test.[202]  An

---

[198] *See Culbreath v. Dep't of Water Res.*, No. C034571, 2002 WL 433545, at *8 (Cal. Ct. App. 2002); *Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998).

[199] *Gill v. City & Cty. of San Francisco*, No. A149019, 2018 WL 1444160, at *8 (Cal. Ct. App. 2018) (Adverse employment actions are "more disruptive than a mere inconvenience or an alteration of job responsibilities.  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits or significantly diminished material responsibilities . . . . The employment action must be both detrimental and substantial."); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004) ("a mere inconvenience or an alteration of job responsibilities," will not suffice).

[200] *Loggins v. Kaiser Permanente Int'l.*, 60 Cal. Rptr. 3d 45, 50–51 (Cal. Ct. App. 2007) ("When a plaintiff alleges retaliatory employment termination either as a claim under the FEHA or as a claim for wrongful employment termination in violation of public policy, and the defendant seeks summary judgment, California follows the burden shifting analysis of *McDonnell Douglas*.").

[201] *Florez v. Holly Corp.*, 154 F. App'x 707, 708 (10th Cir. 2005) (citing *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir. 1998)).

[202] *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1226 (10th Cir. 2014).

entity is deemed an employer if either test weighs in favor of the plaintiff.[203]  As a general rule, determining whether an entity qualifies as an employer is a fact issue for the jury.[204]

The joint employer test is proper where "an employee of one entity seeks to hold another entity liable as an employer."[205]  In other words, "[the] joint-employer test acknowledges that the two entities are separate, but looks to whether they co-determine the essential terms and conditions of employment."[206]  "Both entities are employers if they both 'exercise significant control over the same employees.'"[207]  "Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances."[208]  To determine control, courts also consider whether the employer may "promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; . . . day-to-day supervision of employees, including employee discipline; and . . . control of employee records, including payroll, insurance, taxes and the like."[209]

Defendants assert that KAABOO hired Wingerd and paid his salary, and that Wingerd never provided services to Madison.  Further, Defendants assert that no person acting in their Madison capacity made any employment decisions regarding Wingerd, including decisions concerning his day-to-day work or his termination.  However, it is controverted whether Gordon and Earnest were acting in their capacities at KAABOO or Madison when then made employment decisions concerning Wingerd.  For example, when Earnest communicated with

---

[203] *Bristol v. Bd. of Cty. Comm'rs of Cty. of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002).

[204] *Id.* at 1221.

[205] *Id.*

[206] *Id.* at 1218.

[207] *Knitter*, 758 F.3d at 1226 (quoting *Bristol*, 312 F.3d at 1218).

[208] *Id.*

[209] *Id.* (alteration in original).

Wingerd about the disability policy governing his medical leave, she did so from her @madisoncos.com email address.[210]  Wingerd's medical leave was tracked on workforcenow.adp.com, which includes Madison's logo on the webpage.[211]  It is also controverted whether Madison oversaw Wingerd's assignments and reviewed the quality of Wingerd's work—Wingerd's January 2017 quarterly review was entitled "The Madison Companies, LLC Quarterly Review."[212]

Wingerd was KAABOO's Senior Vice President of Marketing, and Gordon, Chairman and Chief Executive Officer of KAABOO and the Managing Director of Madison, reviewed and directed Wingerd's day-to-day work.  When Gordon recruited Wingerd for employment, he described Madison as the employer and KAABOO as the project.  Drawing all inferences in the light most favorable to Wingerd, the Court finds there is a genuine issue of material fact as to whether Madison was Wingerd's joint-employer.  Because an entity is deemed an employer if either test weighs in favor of the plaintiff, the Court need not decide at summary judgment whether Madison qualifies as Wingerd's employer under the single employer test.  The issue of Madison's liability is properly left for a jury.

Finally, there is a genuine issue of material fact as to how many employees Madison employs.  An employer must have at least fifteen employees to be covered by the ADA.[213]  However, under the joint-employer test, the number of employees may be aggregated to determine whether the company employees fifteen employees if the "second employer . . .

---

[210] Doc. 128-73 at 6.

[211] Doc. 128-63.

[212] Doc. 128-64.

[213] 42 U.S.C. § 12111(2).

exercised substantial control."[214]  Defendants assert that Madison currently has no employees, and in 2017, had between four and eight employees.  Wingerd asserts that KAABOO has thirty-five to forty employees.  As there is a genuine issue of material fact as to whether Madison was Wingerd's employer, as well as the degree of control Madison exercises over KAABOO employees, the Court finds that summary judgment on the issue of Madison's liability is inappropriate.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' motion for summary judgment is granted in part and denied in part (Doc. 117).  Court **grants** summary judgment on Wingerd's ADEA, FLSA, and state law wrongful termination claims (Counts III, IV, VI, VIII, and X), **denies** summary judgment on Wingerd's ADA disability discrimination and retaliation claims and state law wrongful demotion claims (Counts I, II, V, VII, and IX), and **denies** summary judgment on the issue of Madison's liability.

**IT IS SO ORDERED.**

Dated: March 12, 2019

                    S/ Julie A. Robinson
                    JULIE A. ROBINSON
                    CHIEF UNITED STATES DISTRICT JUDGE

---

[214] *Burdett v. Abrasive Eng'g & Tech, Inc.*, 989 F. Supp. 1107, 1111–12 (D. Kan. 1997).